# PARHAM *v.* HUGHES

No. 78–3.   Argued January 15, 1979—Decided April 24, 1979

STEWART, J., announced the judgment of the Court and delivered an opinion, in which BURGER, C. J., and REHNQUIST and STEVENS, JJ., joined. POWELL, J., filed an opinion concurring in the judgment, *post*, p. 359. WHITE, J., filed a dissenting opinion, in which BRENNAN, MARSHALL, and BLACKMUN, JJ., joined, *post*, p. 361.

*Thomas E. Greer* argued the cause for appellant. With him on the brief was *Robert D. Tisinger.*

*A. Montague Miller* argued the cause and filed a brief for appellee.

MR. JUSTICE STEWART announced the judgment of the Court and delivered an opinion, in which THE CHIEF JUSTICE, MR. JUSTICE REHNQUIST, and MR. JUSTICE STEVENS joined.

Under § 105–1307 of the Georgia Code (1978) (hereinafter Georgia statute),[1] the mother of an illegitimate child can

---

[1] Section 105–1307 provides:

"A mother, or, if no mother, a father, may recover for the homicide of a child, minor or sui juris, unless said child shall leave a wife, husband or

sue for the wrongful death of that child. A father who has legitimated a child can also sue for the wrongful death of the child if there is no mother. A father who has not legitimated a child, however, is precluded from maintaining a wrongful-death action. The question presented in this case is whether this statutory scheme violates the Equal Protection or Due Process Clause of the Fourteenth Amendment by denying the father of an illegitimate child who has not legitimated the child the right to sue for the child's wrongful death.

I

The appellant was the biological father of Lemuel Parham, a minor child who was killed in an automobile collision. The child's mother, Cassandra Moreen, was killed in the same collision. The appellant and Moreen were never married to each other, and the appellant did not legitimate the child as he could have done under Georgia law.[2] The appellant did, however, sign the child's birth certificate and contribute to his support.[3] The child took the appellant's name and was visited by the appellant on a regular basis.

---

child. The mother or father shall be entitled to recover the full value of the life of such child. *In suits by the mother the illegitimacy of the child shall be no bar to a recovery.*" (Emphasis added.)

[2] Under Ga. Code § 74–103 (1978), a natural father can have his child legitimated by court order. Section 74–103 provides:

"A father of an illegitimate child may render the same legitimate by petitioning the superior court of the county of his residence, setting forth the name, age, and sex of such child, and also the name of the mother; and if he desires the name changed, stating the new name, and praying the legitimation of such child. Of this application the mother, if alive, shall have notice. Upon such application, presented and filed, the court may pass an order declaring said child to be legitimate, and capable of inheriting from the father in the same manner as if born in lawful wedlock, and the name by which he or she shall be known."

[3] Under Ga. Code § 74–202 (1978), a father is required to support an illegitimate child until the child reaches 18, marries, or becomes self-supporting, whichever occurs first.

After the child was killed in the automobile collision, the appellant brought an action seeking to recover for the allegedly wrongful death. The complaint named the appellee (the driver of the other automobile involved in the collision) as the defendant, and charged that negligence on the part of the appellee had caused the death of the child. The child's maternal grandmother, acting as administratrix of his estate, also brought a lawsuit against the appellee to recover for the child's wrongful death.[4]

The appellee filed a motion for summary judgment in the present case, asserting that under the Georgia statute the appellant was precluded from recovering for his illegitimate child's wrongful death. The trial court held that the Georgia statute violated both the Due Process and Equal Protection Clauses of the Fourteenth Amendment and, accordingly, denied a summary judgment in favor of the appellee. On appeal, the Georgia Supreme Court reversed the ruling of the trial court. 241 Ga. 198, 243 S. E. 2d 867. The appellate court found that the statutory classification was rationally related to three legitimate state interests: (1) the interest in avoiding difficult problems of proving paternity in wrongful-death actions; (2) the interest in promoting a legitimate family unit; and (3) the interest in setting a standard of morality by not according to the father of an illegitimate child the statutory right to sue for the child's death. Accordingly, the court held that the statute did not violate either the Equal Protection or Due Process Clause of the Fourteenth Amendment. We noted probable jurisdiction of this appeal from the judgment of the Georgia Supreme Court. 439 U. S. 815.

---

[4] Georgia Code § 105–1309 (1978) provides:

"In cases where there is no person entitled to sue under the foregoing provisions of this Chapter [the wrongful-death Chapter], the administrator or executor of the decedent may sue for and recover and hold the amount recovered for the benefit of the next of kin. In any such case the amount of the recovery shall be the full value of the life of the decedent."

## II

State laws are generally entitled to a presumption of validity against attack under the Equal Protection Clause. *Lockport* v. *Citizens for Community Action,* 430 U. S. 259, 272. Legislatures have wide discretion in passing laws that have the inevitable effect of treating some people differently from others, and legislative classifications are valid unless they bear no rational relationship to a permissible state objective. *New York City Transit Authority* v. *Beazer,* 440 U. S. 568; *Vance* v. *Bradley,* 440 U. S. 93; *Massachusetts Bd. of Retirement* v. *Murgia,* 427 U. S. 307, 314; *Dandridge* v. *Williams,* 397 U. S. 471, 485.

Not all legislation, however, is entitled to the same presumption of validity. The presumption is not present when a State has enacted legislation whose purpose or effect is to create classes based upon racial criteria, since racial classifications, in a constitutional sense, are inherently "suspect." *McLaughlin* v. *Florida,* 379 U. S. 184; *Brown* v. *Board of Education,* 347 U. S. 483. And the presumption of statutory validity may also be undermined when a State has enacted legislation creating classes based upon certain other immutable human attributes. See, *e. g., Oyama* v. *California,* 332 U. S. 633 (national origin); *Graham* v. *Richardson,* 403 U. S. 365 (alienage); *Gomez* v. *Perez,* 409 U. S. 535 (illegitimacy); *Reed* v. *Reed,* 404 U. S. 71 (gender).

In the absence of invidious discrimination, however, a court is not free under the aegis of the Equal Protection Clause to substitute its judgment for the will of the people of a State as expressed in the laws passed by their popularly elected legislatures. "The Constitution presumes that, absent some reason to infer antipathy, even improvident decisions will eventually be rectified by the democratic process and that judicial intervention is generally unwarranted no matter how unwisely we may think a political branch has acted." *Vance* v. *Bradley,* 440 U. S., at 97 (footnote omitted). The thresh-

old question, therefore, is whether the Georgia statute is invidiously discriminatory. If it is not, it is entitled to a presumption of validity and will be upheld "unless the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that we can only conclude that the legislature's actions were irrational." *Ibid.*

## III

The appellant relies on decisions of the Court that have invalidated statutory classifications based upon illegitimacy and upon gender to support his claim that the Georgia statute is unconstitutional. Both of these lines of cases have involved laws reflecting invidious discrimination against a particular class. We conclude, however, that neither line of decisions is applicable in the present case.

## A

The Court has held on several occasions that state legislative classifications based upon illegitimacy—*i. e.,* that differentiate between illegitimate children and legitimate children—violate the Equal Protection Clause. *E. g., Trimble* v. *Gordon,* 430 U. S. 762; *Weber* v. *Aetna Casualty & Surety Co.,* 406 U. S. 164.[5] The basic rationale of these decisions is that it is unjust and ineffective for society to express its condemnation of procreation outside the marital relationship by punishing the illegitimate child who is in no way responsible for his situation and is unable to change it. As MR. JUSTICE POWELL stated for the Court in the *Weber* case:

"The status of illegitimacy has expressed through the ages society's condemnation of irresponsible liaisons be-

---

[5] In cases where statutory classifications affecting illegitimates are so precisely structured as to further a sufficiently adequate state interest, however, the Court has upheld the validity of the statutes. *Lalli* v. *Lalli,* 439 U. S. 259; *Mathews* v. *Lucas,* 427 U. S. 495; *Labine* v. *Vincent,* 401 U. S. 532.

yond the bonds of marriage. But visiting this condemnation on the head of an infant is illogical and unjust. Moreover, imposing disabilities on the illegitimate child is contrary to the basic concept of our system that legal burdens should bear some relationship to individual responsibility or wrongdoing. Obviously, no child is responsible for his birth and penalizing the illegitimate child is an ineffectual—as well as an unjust—way of deterring the parent." *Id.*, at 175.

It is apparent that this rationale is in no way applicable to the Georgia statute now before us. The statute does not impose differing burdens or award differing benefits to legitimate and illegitimate children. It simply denies a natural father the right to sue for his illegitimate child's wrongful death. The appellant, as the natural father, was responsible for conceiving an illegitimate child and had the opportunity to legitimate the child but failed to do so. Legitimation would have removed the stigma of bastardy and allowed the child to inherit from the father in the same manner as if born in lawful wedlock. Ga. Code § 74–103 (1978). Unlike the illegitimate child for whom the status of illegitimacy is involuntary and immutable, the appellant here was responsible for fostering an illegitimate child and for failing to change its status. It is thus neither illogical nor unjust for society to express its "condemnation of irresponsible liaisons beyond the bounds of marriage" by not conferring upon a biological father the statutory right to sue for the wrongful death of his illegitimate child. The justifications for judicial sensitivity to the constitutionality of differing legislative treatment of legitimate and illegitimate children are simply absent when a classification affects only the fathers of deceased illegitimate children.

### B

The Court has also held that certain classifications based upon sex are invalid under the Equal Protection Clause, *e. g.,*

*Reed* v. *Reed,* 404 U. S. 71; *Stanton* v. *Stanton,* 421 U. S. 7; *Frontiero* v. *Richardson,* 411 U. S. 677; *Craig* v. *Boren,* 429 U. S. 190. Underlying these decisions is the principle that a State is not free to make overbroad generalizations based on sex which are entirely unrelated to any differences between men and women or which demean the ability or social status of the affected class. Thus, in *Reed* v. *Reed, supra,* the Court was faced with the question of the constitutionality of an Idaho probate code provision that gave men a mandatory preference over women, in the same degree of relationship to the decedent, in the administration of the decedent's estate. The Court held that "[b]y providing dissimilar treatment for men and women who are thus similarly situated, the challenged section violates the Equal Protection Clause." 404 U. S., at 77. Similarly, in *Frontiero* v. *Richardson, supra,* the Court invalidated the federal Armed Services benefit statutes that were based on the assumption that female spouses of servicemen were financially dependent while similarly situated male spouses of servicewomen were not. 411 U. S., at 690–691. And in the *Stanton* case, the Court held constitutionally invalid a Utah statute which provided that males had to reach a greater age than females to attain majority status. In reaching this result, the Court rejected the "old notion" that the female is "destined solely for the home and the rearing of the family, and only the male for the marketplace and the world of ideas." 421 U. S., at 14–15. See also *Orr* v. *Orr,* 440 U. S. 268.

In cases where men and women are not similarly situated, however, and a statutory classification is realistically based upon the differences in their situations, this Court has upheld its validity. In *Schlesinger* v. *Ballard,* 419 U. S. 498, for example, the Court upheld the constitutionality of a federal statute which provided that male naval officers who were not promoted within a certain length of time were subject to mandatory discharge while female naval officers who were not

promoted within the same length of time could continue as officers. Because of restrictions on women officers' seagoing service, their opportunities to compile records entitling them to promotion were more restricted than were those of their male counterparts. Thus, unlike the *Reed* and *Frontiero* cases where the gender-based classifications were based solely on administrative convenience and outworn cliches, the different treatment in the *Schlesinger* case reflected "not archaic and overbroad generalizations, but, instead, the demonstrable fact that male and female line officers in the Navy are *not* similarly situated with respect to opportunities for professional service." 419 U. S., at 508 (emphasis in original).

With these principles in mind, it is clear that the Georgia statute does not invidiously discriminate against the appellant simply because he is of the male sex. The fact is that mothers and fathers of illegitimate children are not similarly situated. Under Georgia law, only a father can by voluntary unilateral action make an illegitimate child legitimate.[6] Unlike the mother of an illegitimate child whose identity will rarely be in doubt, the identity of the father will frequently be unknown. *Lalli* v. *Lalli*, 439 U. S. 259.[7] By coming forward

---

[6] The constitutionality of the legitimation provision of the Georgia statute has not been challenged and is not at issue in this case.

[7] As MR. JUSTICE POWELL stated for the plurality in the *Lalli* case:

"That the child is the child of a particular woman is rarely difficult to prove. Proof of paternity, by contrast, frequently is difficult when the father is not part of a formal family unit. The putative father often goes his way unconscious of the birth of a child. Even if conscious, he is very often totally unconcerned because of the absence of any ties to the mother. Indeed the mother may not know *who* is responsible for her pregnancy." 439 U. S., at 268–269. (Citations omitted.)

In *Glona* v. *American Guarantee & Liability Ins. Co.*, 391 U. S. 73, the Court held that a Louisiana statute that did not allow a natural mother of an illegitimate child to sue for its wrongful death violated the Equal Protection Clause. That cause was quite different from this one. The invidious discrimination perceived in that case was between married and unmarried mothers. There thus existed no real problem of identity

with a motion under § 74–103 of the Georgia Code, however, a father can both establish his identity and make his illegitimate child legitimate.[8]

Thus, the conferral of the right of a natural father to sue for the wrongful death of his child only if he has previously acted to identify himself, undertake his paternal responsibilities, and make his child legitimate, does not reflect any overbroad generalizations about men as a class, but rather the reality that in Georgia only a father can by unilateral action legitimate an illegitimate child. Since fathers who do legitimate their children can sue for wrongful death in precisely the same circumstances as married fathers whose children were legitimate *ab initio*, the statutory classification does not discriminate against fathers as a class but instead distinguishes between fathers who have legitimated their children and those who have not.[9] Such a classification is quite unlike those condemned in the *Reed, Frontiero,* and *Stanton* cases which were premised upon overbroad generalizations and excluded

_____

or of fraudulent claims. See Part IV, *infra.* Moreover, the statute in *Glona* excluded every mother of an illegitimate child from bringing a wrongful-death action while the Georgia statute at issue here excludes only those fathers who have not legitimated their children. Thus, the Georgia statute has in effect adopted "a middle ground between the extremes of complete exclusion and case-by-case determination of paternity." *Trimble* v. *Gordon,* 430 U. S. 762, 771. Cf. *Lalli* v. *Lalli, supra.* We need not decide whether a statute which completely precluded fathers, as opposed to mothers, of illegitimate children from maintaining a wrongful-death action would violate the Equal Protection Clause.

[8] See n. 2, *supra.*

[9] The ability of a father to make his child legitimate under Georgia law distinguishes this case from *Caban* v. *Mohammed, post,* p. 380, decided today. The Georgia legitimation provision enables the father to change the child's status, and thereby his own for purposes of the wrongful-death statute, and at the same time is a rational method for the State to deal with the problem of proving paternity. *Lalli* v. *Lalli, supra;* see Part IV, *infra.* In the *Caban* case, by contrast, the father could change neither his children's status nor his own for purposes of the New York adoption statute.

all members of one sex even though they were similarly situated with members of the other sex.

## IV

Having concluded that the Georgia statute does not invidiously discriminate against any class, we still must determine whether the statutory classification is rationally related to a permissible state objective.

This Court has frequently recognized that a State has a legitimate interest in the maintenance of an accurate and efficient system for the disposition of property at death. *E. g., Lalli* v. *Lalli, supra; Trimble* v. *Gordon,* 430 U. S. 762; *Labine* v. *Vincent,* 401 U. S. 532. Of particular concern to the State is the existence of some mechanism for dealing with "the often difficult problem of proving the paternity of illegitimate children and the related danger of spurious claims against intestate estates." *Lalli* v. *Lalli, supra,* at 265. See also *Gomez* v. *Perez,* 409 U. S., at 538.

This same state interest in avoiding fraudulent claims of paternity in order to maintain a fair and orderly system of decedent's property disposition is also present in the context of actions for wrongful death. If paternity has not been established before the commencement of a wrongful-death action, a defendant may be faced with the possibility of multiple lawsuits by individuals all claiming to be the father of the deceased child. Such uncertainty would make it difficult if not impossible for a defendant to settle a wrongful-death action in many cases, since there would always exist the risk of a subsequent suit by another person claiming to be the father.[10] The State of Georgia has chosen to deal with this problem by allowing only fathers who have established their paternity by legitimating their children to sue for wrongful

---

[10] Indeed, a similar uncertainty is evident in the present case. The appellee has been sued by both the administratrix of the estate and the appellant for the wrongful death of the child.

death, and we cannot say that this solution is an irrational one.   Cf. *Lalli* v. *Lalli*, 439 U. S. 259.[11]

The appellant argues, however, that whatever may be the problem with establishing paternity generally, there is no question in this case that he is the father.   This argument misconceives the basic principle of the Equal Protection Clause.   The function of that provision of the Constitution is to measure the validity of classifications created by state laws.[12]   Since we have concluded that the classification created by the Georgia statute is a rational means for dealing with the problem of proving paternity, it is constitutionally irrelevant that the appellant may be able to prove paternity in another manner.

## V

The appellant also alleges that the Georgia statute violates the Due Process Clause of the Fourteenth Amendment.   Nowhere in the appellant's brief or oral argument, however, is there any explanation of how the Due Process Clause is implicated in this case.   The only decision of this Court cited by the appellant that is even remotely related to his due process claim is *Stanley* v. *Illinois,* 405 U. S. 645.   In the *Stanley* case, the Court held that a father of illegitimate children who had raised these children was entitled to a hearing on his fitness as a parent before they could be taken from him by the State of Illinois.   The interests which the Court found controlling in *Stanley* were the integrity of the family against state interference and the freedom of a father to raise his own children.   The present case is quite a different

---

[11] We thus need not decide whether the classification created by the Georgia statute is rationally related to the State's interests in promoting the traditional family unit or in setting a standard of morality.

[12] It cannot seriously be argued that a statutory entitlement to sue for the wrongful death of another is itself a "fundamental" or constitutional right.

one, involving as it does only an asserted right to sue for money damages.

For these reasons, the judgment of the Supreme Court of Georgia is affirmed.

*It is so ordered.*

Mr. Justice Powell, concurring in the judgment.

I agree that the gender-based distinction of Ga. Code § 105–1307 (1978) does not violate equal protection.* I write separately, however, because I arrive at this conclusion by a route somewhat different from that taken by Mr. Justice Stewart.

To withstand judicial scrutiny under the Equal Protection Clause, gender-based distinctions must "serve important governmental objectives and must be substantially related to achievement of those objectives." *Craig* v. *Boren,* 429 U. S. 190, 197 (1976). See *Orr* v. *Orr,* 440 U. S. 268, 279 (1979); *Stanton* v. *Stanton,* 421 U. S. 7, 14 (1975); *Reed* v. *Reed,* 404 U. S. 71 (1971). We have recognized in various contexts the importance of a State's interest in minimizing potential problems in identifying the natural father of an illegitimate child. See, *e. g., Caban* v. *Mohammed, post,* at 393 n. 15 (adoptions); *Lalli* v. *Lalli,* 439 U. S. 259, 268–269 (1978) (inheritance); *Gomez* v. *Perez,* 409 U. S. 535, 538 (1973) (child support). Indeed, we have sought to avoid "impos[ing] on state court systems a greater burden" in determining paternity for purposes of wrongful-death actions. *Weber* v. *Aetna Casualty & Surety Co.,* 406 U. S. 164, 174 (1972).

The question, therefore, is whether the gender-based distinction at issue in the present case is substantially related to achievement of the important state objective of avoiding diffi-

---

*I also agree with Mr. Justice Stewart that the classification of § 105–1307 affects only fathers of illegitimates—not the illegitimates themselves—and therefore that this case differs substantially from those in which we have found classifications based upon illegitimacy to be unconstitutional. See, *e. g., Trimble* v. *Gordon,* 430 U. S. 762 (1977).

cult problems in proving paternity after the death of an illegitimate child. In Ga. Code § 74–103 (1978), the State has provided a simple, convenient mechanism by which the father of an illegitimate child can eliminate all questions concerning the child's parentage. Under that statute, a father can legitimate his child simply by filing a petition in state court identifying the child and its mother and requesting an order of legitimation. After notice has been served on the mother, the state court can enter an order declaring the child legitimate for all purposes of Georgia law.

It is clear that the Georgia statute is substantially related to the State's objective. It lies entirely within a father's power to remove himself from the disability that only he will suffer. The father is required to declare his intentions at a time when both the child and its mother are likely to be available to provide evidence. The mother, on the other hand, is given the opportunity to appear and either support or rebut the father's claim of paternity. The marginally greater burden placed upon fathers is no more severe than is required by the marked difference between proving paternity and proving maternity—a difference we have recognized repeatedly. See, e. g., Lalli v. Lalli, supra, at 268–269.

I find the present case to be quite different from others in which the Court has found unjustified a State's reliance upon a gender-based classification. In several cases, the Court has confronted a state law under which the burdened individual (whether a child born out of wedlock or the father of such a child) has been powerless to remove himself from the statutory burden—regardless of the proof of paternity. See, e. g., Caban v. Mohammed, post, p. 380; Trimble v. Gordon, 430 U. S. 762 (1977). To require marriage between the father and mother often is tantamount to a total exclusion of fathers, as marriage is possible only with the consent of the mother. In the present case, however, no such requirement is imposed upon the father under Georgia law. In sum, therefore, I con-

clude that the Georgia statute challenged in this case, unlike the statutes reviewed in our prior decisions, is substantially related to the State's objective of avoiding difficult problems of proof of paternity.

MR. JUSTICE WHITE, with whom MR. JUSTICE BRENNAN, MR. JUSTICE MARSHALL, and MR. JUSTICE BLACKMUN join, dissenting.

Appellant is the father, rather than the mother, of a deceased illegitimate child. It is conceded that for this reason alone he may not bring an action for the wrongful death of his child. Yet four Members of the Court conclude that appellant is not discriminated against "simply" because of his sex, *ante,* at 355, because Georgia provides a means by which fathers can legitimate their children. The dispositive point is that only a father may avail himself of this process. Therefore, we are told, "[t]he fact is that mothers and fathers of illegitimate children are not similarly situated," *ibid.*

There is a startling circularity in this argument. The issue before the Court is whether Georgia may require unmarried fathers, but not unmarried mothers, to have pursued the statutory legitimization procedure in order to bring suit for the wrongful death of their children. Seemingly, it is irrelevant that as a matter of state law mothers may not legitimate their children,[1] for they are not required to do so in order to maintain a wrongful-death action. That only fathers *may* resort to the legitimization process cannot dissolve the sex discrimination in *requiring* them to.[2] Under the plurality's

---

[1] Although Ga. Code § 74–103 (1978) provides that a father may petition, with notice to the mother, to legitimate his child, mothers are not given a similar right. At least one State provides that either parent, or both, may legitimate a child. La. Civ. Code Ann., Art. 203 (West 1952).

[2] The plurality not only fails to examine whether required resort by fathers to the legitimization procedure bears more than a rational relationship to any state interest, but also fails even to address the constitu-

bootstrap rationale, a State could require that women, but not men, pass a course in order to receive a taxi license, simply by limiting admission to the course to women.[3]

The plain facts of the matter are that the statute conferring the right to recovery for the wrongful death of a child discriminates between unmarried mothers and unmarried fathers, and that this discrimination is but one degree greater than the statutory discrimination between married mothers and married fathers.[4]   In order to withstand scrutiny under the Equal Protection Clause, gender-based discrimination " 'must serve important governmental objectives and must be substantially related to achievement of those objectives.' "   *Caban* v. *Mohammed, post,* at 388, quoting *Craig* v. *Boren,* 429 U. S. 190, 197 (1976).   Because none of the interests urged by the State warrant the sex discrimination in this case, I would reverse the judgment below.

I

The Georgia Supreme Court suggested that the state legislature may have denied a right of action to fathers of illegitimate children because of its interests in "promoting a legitimate family unit" and "setting a standard of morality."

---

tionality of the sex discrimination in allowing fathers but not mothers to legitimate their children.   It is anomalous, at least, to assert that sex discrimination in one statute is constitutionally invisible because it is tied to sex discrimination in another statute, without subjecting *either* of these classifications on the basis of sex to an appropriate level of scrutiny.

[3] Men and women would therefore not be "similarly situated."   Yet requiring a course for women but not for men is quite obviously a classification on the basis of sex.

[4] The opinion of MR. JUSTICE STEWART shunts aside the readily apparent classification on the basis of sex in Georgia's wrongful-death scheme by stressing that appellant's child was never made legitimate, but it is only the fortuitous event of the mother's death in this case that makes legitimacy even relevant.   In the case of parents of legitimate children, only the mother may sue if she is alive; the father is allowed to sue only "if [there is] no mother."   Ga. Code § 105–1307 (1978).   See also *infra,* at 368.

241 Ga. 198, 200, 243 S. E. 2d 867, 869–870 (1978). But the actual relationship between these interests and the particular classification chosen is far too tenuous to justify the sex discrimination involved. Cf. *Trimble* v. *Gordon,* 430 U. S. 762, 768 (1977).

Unmarried mothers and those fathers who legitimate their children but remain unmarried presumably also defy the state interest in "the integrity of the family unit." [5] In any event, it is untenable to conclude that denying parents a right to recover when their illegitimate children die will further the asserted state interests. In *Glona* v. *American Guarantee & Liability Ins. Co.,* 391 U. S. 73 (1968), we were faced with the same argument in the context of an unmarried mother's attempt to recover for her child's death in a State allowing wrongful-death suits by parents of legitimate children. Even though that mother—like appellant in this case—had not pursued a statutory procedure whereby she could have unilaterally legitimated her child and thereby become eligible to sue for the child's death,[6] we held that it was impermissible to prevent her from seeking to recover. What we said in *Glona* about unmarried mothers applies equally to unmarried fathers:

> "[W]e see no possible rational basis . . . for assuming that if the natural mother is allowed recovery for the wrongful death of her illegitimate child, the cause of illegitimacy will be served. It would, indeed, be farfetched to assume that women have illegitimate children so that they can be compensated in damages for their death." *Id.,* at 75.

See also *Weber* v. *Aetna Casualty & Surety Co.,* 406 U. S. 164, 173 (1972).

---

[5] *Lalli* v. *Lalli,* 439 U. S. 259, 265 (1978). See also *Trimble* v. *Gordon,* 430 U. S. 762, 769 (1977).

[6] See n. 1, *supra; Glona* v. *American Guarantee & Liability Ins. Co.,* 391 U. S., at 79 n. 7 (Harlan, J., dissenting).

## II

Another interest suggested by the Georgia Supreme Court, which a majority of the Court today finds pervasive, is that of "forestalling potential problems of proof of paternity," 241 Ga., at 200, 243 S. E. 2d, at 869. Whatever may be the evidentiary problems associated with proof of parenthood where a father, but presumably not a mother,[7] is involved, I am sure that any interest the State conceivably has in simplifying the determination of liability in wrongful-death actions does not justify the outright gender discrimination in this case.

The Court has shown due respect for a State's undoubted interest in effecting a sound system of inheritance that will not unduly tie up the assets of the deceased, including his real estate, and prevent its transmission to and utilization by his heirs and the upcoming generation.[8] Formal documentation of entitlement to inherit may be significant in avoiding unending litigation inimical to this interest. But the State has no comparable interest in protecting a tortfeasor from having his liability litigated and determined in the usual way. There is always the possibility of spurious claims in tort litigation, and

---

[7] But cf. *Glona* v. *American Guarantee & Liability Ins. Co., supra,* at 76 ("Opening the courts to suits [by the mother of an illegitimate child] may conceivably be a temptation to some to assert motherhood fraudulently").

[8] See *Lalli* v. *Lalli, supra; Trimble* v. *Gordon, supra,* at 771, and cases cited therein. Where discrimination on a basis triggering heightened judicial scrutiny is alleged, judicial deference has given way in the context of other statutorily created entitlements, see, *e. g., Weinberger* v. *Wiesenfeld,* 420 U. S. 636 (1975); *Gomez* v. *Perez,* 409 U. S. 535 (1973); *Griffin* v. *Richardson,* 409 U. S. 1069 (1972), summarily aff'g 346 F. Supp. 1226 (Md.); *Weber* v. *Aetna Casualty & Surety Co.,* 406 U. S. 164 (1972), including wrongful-death recovery; *Glona, supra; Levy* v. *Louisiana,* 391 U. S. 68 (1968). In *Weber,* the Court, per MR. JUSTICE POWELL, expressly analogized the state interest in deciding who may sue for wrongful death to the interest in deciding who may receive workmen's compensation, and rejected the assertion that the interest in the latter is as substantial as that in intestacy succession, 406 U. S., at 170–172.

the plaintiff will have the burden of proof if his parenthood is challenged.[9] The legitimization requirement is not merely a rule concerning the competency of evidence [10] but an absolute prerequisite to recovery for the wrongful death of a child, barring many who are capable of proving their parenthood, solely because they are fathers. It denigrates the judicial process, as well as the interest in foreclosing gender-based discriminations, to hold that the possibility of erroneous determinations of paternity in an unknown number of cases, likely to be few, is sufficient reason to forbid all natural, unmarried fathers who have not legitimated their children from seeking to prove their parenthood and recovering in damages for the tort that has been committed.[11]

Much the same is true of the rather lame suggestion that keeping fathers such as this appellant out of court will protect wrongdoers and their insurance companies from multiple re-

[9] See also *Glona* v. *American Guarantee & Liability Ins. Co., supra,* at 76 ("That problem [of fraudulent assertion of motherhood] . . . concerns burden of proof"). Although appellant in this case has substantial evidence of his paternity and it is clear that but for the legitimization requirement there would be no challenge to his capacity to sue, other unmarried fathers whose paternity is challenged may be unable—particularly when, as here, the mother is dead—to offer sufficient evidence to convince the factfinder of paternity.

[10] Cf. *Mathews* v. *Lucas,* 427 U. S. 495 (1976) (upholding the denial of survivors' benefits under the Social Security Act to illegitimate children unless they are entitled to inherit under state intestacy law or are able to show paternity in one of several other ways, including written acknowledgment by the father, 42 U. S. C. § 402 (d) (3)).

[11] Certainly, the Court has not shown such solicitude for the problem of an erroneous determination of paternity when the claimed father is the defendant rather than the plaintiff. See *Gomez* v. *Perez, supra,* at 538 (holding that a State must entitle illegitimate, as well as legitimate, children to paternal support: "We recognize the lurking problems with respect to proof of paternity. Those problems are not to be lightly brushed aside, but neither can they be made into an impenetrable barrier that works to shield otherwise invidious discrimination").

coveries. This claimed danger is but one of many potential hazards in personal injury litigation, and it is very doubtful that it would be exacerbated if the Georgia statute in this case were stricken down. Assuming that there might be a few occasions where multiple recoveries are threatened, steps could be taken to settle liability in one proceeding, just as actions to quiet title to real estate need not be reopened at every turn. Whatever risks there may be, however, are not sufficient to justify foreclosing suit by the many, many fathers like Parham, about whose parenthood there is very little doubt indeed.[12]

## III

The fourth and final interest suggested by the Supreme Court of Georgia as a reason that the state legislature may have denied the wrongful-death action to fathers such as appellant is that "more often than not the father of an illegitimate child who has elected neither to marry the mother nor to legitimate the child pursuant to proper legal proceedings suffers no real loss from the child's wrongful death." 241 Ga., at 200, 243 S. E. 2d, at 870. Unlike the previous hypothesized state interests, this last does at least provide a plausible explanation for the classification at issue. Yet such a legislative conception about fathers of illegitimate children is an unacceptable basis for a blanket discrimination against all such fathers. Whatever may be true with respect to certain of these parents,[13] we have recognized that at least some of them maintain as close a relationship to their children as do unmarried mothers. Thus, in *Caban* v. *Mohammed, post,* p. 380, we struck down a statutory discrimination in adoption

---

[12] See also *Reed* v. *Reed,* 404 U. S. 71, 76 (1971) ("Clearly the objective of reducing the workload on probate courts by eliminating one class of contests is not without some legitimacy. . . . [W]hatever may be said as to the positive values of avoiding intrafamily controversy, the choice in this context may not lawfully be mandated solely on the basis of sex").

[13] See *Lalli* v. *Lalli,* 439 U. S., at 268–269.

proceedings against all unmarried fathers, rejecting the assertion that "broad, gender-based distinction . . . is required by any universal difference between maternal and paternal relations at every phase of a child's development." *Post,* at 389.[14]

Nor does the discrimination against fathers of illegitimate children on the basis of their presumed lack of affection for their children become any more permissible simply because a father who is aware of the State's legitimization procedure may resort to it and thereby become eligible to recover for the wrongful death of his children.[15] Particularly given the facts of this case—where it is conceded that appellant signed his child's birth certificate, continuously contributed to the child's financial support, and maintained daily contact with him [16]—it is unrealistic to presume that unmarried fathers (or mothers [17]) having real interest in their children and suffering palpable loss if their children die will, as a general rule, have pursued a statutory legitimization procedure. Only last Term, we indicated that resort to this very process in the State of

---

[14] In 1977, 15.5% of all children and 51.7% of the black children born in the United States had unmarried parents. U. S. Dept. of HEW, National Center for Health Statistics, 27 Vital Statistics Report, No. 11, p. 19 (1979). The suggestion that anything approaching a majority of the fathers of these children would "suffe[r] no real loss from the child's wrongful death" is incredible.

[15] In *Caban* v. *Mohammed, post,* at 393 n. 15, we noted that even a father who establishes his paternity in Family Court pursuant to N. Y. Family Court Act §§ 511 to 571 (McKinney 1975 and Supp. 1978–1979) may not object to his child's adoption, and thus refusal to allow such objection was not related to the State's interest that the father "sho[w] that it is in fact his child." As explained, *supra,* at 364–366, I have no doubt that this state interest is insufficient in this case also, since even those many fathers presently able to prove their paternity are precluded from bringing suit. *Caban* certainly did not intimate that the failure of that father to have previously established his paternity might suffice to justify discrimination against him on the basis of presumed differences in maternal and paternal relations.

[16] 241 Ga. 198, 199, 243 S. E. 2d 867, 869 (1978).

[17] See text at n. 6, *supra.*

Georgia is not constitutionally acceptable as a surrogate measure of an unmarried father's interest in his child.[18]

Moreover, it is clear that the discrimination at issue in this case does not proceed from merely a considered legislative determination, however unjustified, that parents such as appellant do not suffer loss when their children die. Rather, the particular discrimination in this case is but part of the pervasive sex discrimination in the statute conferring the right to sue for the wrongful death of a child. Even where the deceased is legitimate, the father is absolutely prohibited from bringing a wrongful-death action if the mother is still alive, even if the mother does not desire to bring suit and even if the parents are separated or divorced. The incredible presumption that fathers, but not mothers, of illegitimate children suffer no injury when they lose their children is thus only a more extreme version of the underlying and equally untenable presumption that fathers are less deserving of recovery than are mothers.

If Georgia would prefer that the amount of wrongful-death recovery be based upon the mental anguish and loss of future income suffered when a child dies—rather than on the "full value of the life of such child," as the statute now provides[19]—it may amend the statute. But it may not categorically eliminate on the basis of sex any recovery by those parents it deems uninjured or undeserving.

---

[18] See *Quilloin* v. *Walcott,* 434 U. S. 246, 254 (1978).

[19] See Ga. Code §§ 105–1307, 105–1308 (1978) ("The full value of the life of the decedent, as shown by the evidence, is the full value of the life of the decedent without deduction for necessary or other personal expenses of the decedent had he lived").