**OPERATION BADLAW, INC., et al., Plaintiffs,**

v.

**LICKING COUNTY GENERAL HEALTH DISTRICT BOARD OF HEALTH, et al., Defendants.**

**No. C2–92–241.**

United States District Court, S.D. Ohio, Eastern Division.

June 26, 1992.

Affirmed, 991 F.2d 796.

Grey Wilbur Jones, Enz, Jones & LeGrand, Columbus, OH, for plaintiffs.

Robert Louis Berry, Reid, Berry & Stanard, Columbus, OH, Robert Luther Becker, Newark, OH, for Licking County General Health Dist. Bd. of Health, Patrick Scarpitti, Kathleen Pipes, Janine Shipley.

James William Hostetter, Newark City Law Director, Newark, OH, for Newark City Bd. of Health, Daniel Stricker, Margaret Chaconas, Robin Lynn Green, Cindy Barnes.

## OPINION AND ORDER

GEORGE C. SMITH, District Judge.

This action was filed by plaintiff Operation Badlaw, Inc., a non-profit group based in Licking County, Ohio, on March 16, 1992. On May 20, 1992, the plaintiff filed an amended complaint adding a number of its individual members as additional plaintiffs. The defendants are the Licking County General Health District Board of Health and its members (Licking Board) and the Newark City Board of Health and its members (Newark Board). The plaintiffs allege that the defendants have violated a number of their constitutional rights by passing regulations limiting smoking in public places and places of employment. Operation Badlaw seeks injunctive and declaratory relief. The individual plaintiffs also request compensatory damages.

On April 27, 1992, the defendants filed a motion to dismiss. The plaintiffs responded on May 20, 1992, and the defendants replied on June 1. The motion to dismiss is now ripe for decision.

### I.

A motion to dismiss attacks the sufficiency of the complaint. In ruling upon such motion, the Court must accept as true all well-pleaded allegations of the complaint, and may dismiss the action only if it appears beyond doubt that the Plaintiff can prove no set of facts that would entitle him to relief. *Conley v. Gibson*, 355 U.S. 41, 78 S.Ct. 99, 2

L.Ed.2d 80 (1957). It is with this standard in mind that the motion to dismiss must be decided.

## II.

In January, 1992, the Licking Board and the Newark Board both passed regulations relating to smoking in public places. The two regulations are identically worded, and prohibit smoking in a wide variety of establishments. The regulations are preceded by findings that second-hand smoke is "acutely harmful" to nonsmokers with cardiovascular or respiratory diseases, that smoking in enclosed areas is a public nuisance, and that nonsmokers are currently unable to protect themselves against these hazards.

Smoking in certain "enclosed public places" (healthcare facilities and governmentally-owned structures) is absolutely prohibited; the prohibition against smoking in other enclosed public places, such as stores, public vehicles, theaters, elevators, restrooms, gymnasiums, libraries, and exhibition halls is subject to a procedure for obtaining exemptions. Certain other public places, such as restaurants, hotels, shopping centers, long-term care facilities, and educational facilities, may apply for exemptions or may designate smoking areas. Certain areas within places of employment, including employee work areas, lunchrooms, lounges, and restrooms, are also subject to the no-smoking ban, although employers are also permitted to provide designated areas for smoking. Bars, bowling alleys, and pool halls are exempt so long as they conspicuously display a sign stating that a non-smoking area is not available.

Variances are also made available to any person whose premises would otherwise be subject to the requirements of the regulations. Grounds for such a variance are that "compliance with such requirements has been and is technically not feasible, economically unreasonable, or impossible because of conditions beyond the control of the applicant." Variances are granted or denied by the Boards. Penalties for violating the regulations are also prescribed, including fines and imprisonment.

Operation Badlaw is a grass-roots citizens group which was formed to combat these regulations, and the individual plaintiffs are some of its members. They allege that the regulations violate various provisions of the constitution, including the commerce clause and the contract clause. They also allege that the regulations deprive them of their right to due process and equal protection, as well as infringing on their privacy interests. Finally, they allege that passage of the regulations violates the separation of powers doctrine inherent in the Ohio constitution, and that both the Boards and all of the individual members thereof knew that they did not have the statutory authority to pass either regulation.

The regulations have not yet gone into effect. The defendants agreed to delay implementation in order to allow the parties to present these challenges to the Court. Thus, all of plaintiffs' challenges are to the regulations on their face, since no implementation or enforcement has yet occurred.

## III.

The plaintiffs' claims fall into two general categories. The first category of claims attack the regulations at issue as contrary to the United States Constitution. For purposes of deciding these claims, the Court will assume that the regulations were validly enacted under state law, even though they may be found to be unconstitutional. The second category of claims question whether passage of the regulations was a legitimate exercise of the police power delegated to either (or both) the Licking Board or the Newark Board. Each of these broad issues, and each underlying federal constitutional claim, will be addressed in turn.

### A. *Equal Protection*

Plaintiffs claim that the enforcement of these particular anti-smoking regulations would violate their right to equal protection of the laws. In particular, they assert that the distinctions drawn in the regulations are without rational bases, and that the existence of exemption and variance procedures is also irrational. For the following reasons, the Court concludes that this constitutional challenge is without merit.

■ The equal protection clause of the fourteenth amendment does not require absolutely equal treatment of all similarly situated persons, or the absolutely equal division of governmental benefits. *Ross v. Moffitt*, 417 U.S. 600, 94 S.Ct. 2437, 41 L.Ed.2d 341 (1974). In the absence of a deprivation of a fundamental right or deprivation based on a suspect classification, equal protection requires differing governmental treatment of groups or individuals to be based on no more than a rational relationship to a legitimate state purpose. *New Orleans v. Dukes*, 427 U.S. 297, 303, 96 S.Ct. 2513, 2516–17, 49 L.Ed.2d 511 (1976).

■ It is clear that the right to smoke is not a fundamental right, *Grusendorf v. Oklahoma City*, 816 F.2d 539 (10th Cir.1987), and the plaintiffs do not argue that it is. Additionally, they do not claim that being a smoker or being interested in the rights of smokers makes any of the plaintiffs members of a suspect class. Consequently, if there is a rational basis for the distinctions drawn in the Boards' regulations, they pass muster under the equal protection clause.

■ The standard of analysis under the rationally related test is deferential. *Pennell v. City of San Jose*, 485 U.S. 1, 14, 108 S.Ct. 849, 858–59, 99 L.Ed.2d 1 (1988). Only if the Court can find no set of facts which could possibly support the distinction drawn by the state will it overturn state action. *McGowan v. Maryland*, 366 U.S. 420, 426, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393 (1961). Further, the state need not prove that such a rational relationship exists; rather, the plaintiffs must demonstrate that it is impossible for the state to show any reasonable basis for its action.

In applying the rational basis test, the burden falls upon the party challenging the state enactment to convince the court that its basis is irrational and not upon the state. If it is evident that the question is at least debatable, the attack must fail. Furthermore, the court need not determine what particular reasoning was actually used to justify the enactment, and may even hypothesize as to any possible legitimate state objectives which are promoted by the enactment.

*Zielasko v. State of Ohio*, 693 F.Supp. 577, 586 (N.D.Ohio 1988), *aff'd*, 873 F.2d 957 (6th Cir.1989) (citations omitted); *see also Kelley v. Johnson*, 425 U.S. 238, 247, 96 S.Ct. 1440, 1445–46, 47 L.Ed.2d 708 (1976) (threshold issue is whether the plaintiff can show there is no rational basis for the regulation).

■ The plaintiffs argue that two provisions make it clear that the regulations are not rationally related to the defendants' goal of minimizing the exposure of nonsmokers to second-hand smoke. First, the plaintiffs argue that the existence of a provision for exemptions makes it clear that the regulations are irrational, since the regulations then protect nonsmokers in some environments but not in others, although the threat of harm to nonsmokers is the same. The exemption granted to bowling alleys and bars is cited as one example of this. In addition, the plaintiffs contend that the variance provision contained in the regulations violates the equal protection clause because it permits such variances to issue at the "unfettered judgment" of the Boards. Therefore, they argue, "variances arbitrarily will be granted to some proprietors at [sic] the exclusion of others."

In response to the first argument, the defendants argue that the exemptions to the no-smoking policy established by the regulations are completely rational. Specifically, the defendants claim that the regulations are written in such a way as to maximize the protection available to nonsmokers in traditionally public areas, while minimizing the impact on smokers in more private places. For example, in furtherance of this goal, the regulations are written to ban smoking in open office areas, while permitting smoking in an enclosed, private office. The smoking bans are applicable to bars, bowling alleys or pool halls unless those establishments post signs stating that no non-smoking areas are available. This serves to ensure that persons not wishing to be exposed to second-hand smoke know in advance that smoke may be present. While it is true that this results in some persons being treated differently than others, differences in classification are not unconstitutional unless they either impinge upon a fundamental interest or are not ra-

tionally related to a permissible state objective. *Parham v. Hughes,* 441 U.S. 347, 99 S.Ct. 1742, 60 L.Ed.2d 269 (1979). The Boards could well have chosen to treat non-smokers in bars or poolrooms differently than nonsmokers in offices, based upon the belief that attendance at the former places is more a matter of voluntary choice than at the latter, or upon the belief that smoking bans in such establishments would impact more adversely on their clientele and profitability than, say, at an art museum. Such choices have a rational relationship to the legitimate state purpose of minimizing unwanted exposure to second-hand smoke, and reconciling that purpose with other legitimate state concerns.

█ The plaintiffs' second argument fails for two reasons. In the first place, the Court does not find that the Boards have "unfettered judgment" in deciding when to grant a variance. Rather, the plain language of the regulations gives the Boards authority to grant variances when they find that compliance with the regulations "has been and is technically not feasible, economically unreasonable, or impossible...." This language does not permit the Board to grant variances based solely on whim or caprice.

Further, the Court rejects plaintiffs' argument, based on *Boreali v. Axelrod,* 71 N.Y.2d 1, 523 N.Y.S.2d 464, 517 N.E.2d 1350 (1987), that allowing for variances in a public health regulation is *per se* irrational. The *Boreali* court concluded that such variances could not be justified on health-related grounds, but also clearly recognized that social or economic considerations could be balanced against health concerns and could result in rationally-based exemptions or variances. *Boreali* concluded that a public health agency was not the appropriate governmental body to do that balancing—a conclusion that relates to plaintiffs' argument concerning the Boards' authority to promulgate these regulations or to grant variances—but its holding provides no support for plaintiffs' equal protection argument. Concerns for technical or economic feasibility are typical bases on which the states may make distinctions among persons otherwise similarly situated.

█ Finally, although there may be a possibility that the Boards will, at some time in the future, apply the variance provisions in an unconstitutional or irrational manner, that has not happened. A facially constitutional regulation does not become unconstitutional because it might be applied unconstitutionally. In the event that it is so applied, the plaintiffs would have a claim at that time. This issue is, however, not presented in this case because the regulations have not yet been implemented or enforced. Consequently, plaintiffs' equal protection argument fails.

### B. *Due Process*

The plaintiffs' due process argument is not markedly different from their equal protection claim. Again, they assert that there is no rational connection between public health and the inhalation of second-hand smoke, and that the regulations are therefore completely unrelated to any legitimate subject of public health legislation. They also deny that the state can lawfully restrict smoking in "private areas of employment and other private areas where citizens voluntarily choose to visit." (Plaintiff's Memorandum, at 19). They claim to have evidence that second-hand smoke is not a health hazard, and apparently intend to try to convince the Court of the factual inaccuracy of the Boards' findings to the contrary.

█ It is appropriately difficult for a party challenging legislation to demonstrate that the legislation is, as a factual matter, completely unrelated to any legitimate public concern. In order to fail to meet the constitutional standard of substantive due process, a statute or regulation must either fail to advance a legitimate governmental interest or be an unreasonable means of advancing that interest. *Williamson v. Lee Optical,* 348 U.S. 483, 487–88, 75 S.Ct. 461, 464–65, 99 L.Ed. 563 (1955) (stating that the constitutionality of a law will be upheld if "there is an evil at hand for correction, and that it might be thought that the particular legislative measure was a rational way to correct it."); *see also Curto v. City of Harper Woods,* 954 F.2d 1237 (6th Cir.1992). As the *Curto* court pointed out, it is sufficient to meet the standard for substantive due process if the court

concludes that there *might* be a legitimate reason for the regulation. In the Court's words, "[s]uch supposition is adequate for purposes of performing substantive due process analysis." *Curto,* 954 F.2d at 1243.

■ Further, the Court notes that extensive factual inquiry into the basis of legislative enactments is not ordinarily contemplated, at least in the absence of any claim of bad faith or improper motive on the part of the body which adopted the statute or regulation in question. "Determination of whether a legislative scheme is rationally related to a legitimate government interest is a question of law for the court to determine." *Midnight Sessions, Ltd. v. City of Philadelphia,* 945 F.2d 667, 682 (3d Cir.1991), *cert. denied* — U.S. ——, 112 S.Ct. 1668, 118 L.Ed.2d 389 (1992). This legal question is appropriate for decision in the context of a motion to dismiss.

■ In passing the regulations, both Boards made specific findings that second-hand smoke is both a danger and a nuisance to nonsmokers and that smoking causes damage to merchandise and fires. They further found that nonsmokers are often unable to protect themselves from second-hand smoke, and that certain non-smoking members of the public, such as persons with cardiovascular or respiratory diseases, were at a higher level of risk. These findings were based, at least in part, upon the opinions of the Surgeon General of the United States. Plaintiffs have not alleged that, however one views the validity of these opinions, they were mischaracterized by the Boards or are nonexistent. The preamble to the regulations is sufficient to identify facially legitimate governmental goals (i.e. public health and safety) which they advance, and to show that the Boards had some factual information before them when they adopted the regulations. Assuming that second-hand smoke is a hazard, the regulations bear some rational relationship to minimizing the effects of that hazard. Nothing more is needed to defeat plaintiffs' substantive due process claim. The Court simply does not sit as a "super-legislature" to second-guess legislative factual conclusions when there is any basis at all for reaching them, or to substitute its judgment as to how valid regulatory goals should be accomplished. *Cf. FW/PBS, Inc. v. City of Dallas,* 493 U.S. 215, 236, 110 S.Ct. 596, 610, 107 L.Ed.2d 603 (1990).

■ The plaintiffs also allege that the regulations are overbroad and vague. They do not identify with specificity what portions of the regulations are vague or overbroad, other than to claim that the state has no legitimate interest in prohibiting or regulating smoking in private places. In support, they first contend that they will be able to provide the Court with evidence showing that there are no dangers involved in exposure to second-hand smoke. In addition, even if there are such dangers, the plaintiffs claim that the Boards have no valid interest in regulating smoking in private places, such as work areas, where people "choose to visit." Finally, the plaintiffs again argue that the existence of variance and exemption provisions shows that the regulations are overbroad and/or vague.

Most of these arguments have been fully dealt with above. As to the argument that the Boards are attempting to regulate smoking in private places, the Court cannot agree that work areas or office waiting rooms are places that people only "choose to visit." The regulations are aimed at limiting exposure to second-hand smoke in those places where people are likely to be involuntarily exposed to such smoke. One having business with another may not "choose" to visit the office, but is frequently likely to have no choice in the matter at all. Finally, absent a specific attack on any particular portion of the regulations as being unconstitutionally vague, the Court cannot make such a finding, and rejects that argument as well.

### C. *Liberty and Privacy*

The plaintiffs contend that the regulations infringe on their constitutionally protected rights to liberty and privacy. However, the plaintiffs have no protected liberty interest in smoking. *Grusendorf, supra.* Thus, the Court will consider only whether the regulations improperly infringe on plaintiffs' constitutional right to privacy.

The right to privacy is not explicitly found in the constitution. It has, however, been recognized as being within the "penumbra" of the constitution. *Roe v. Wade,* 410 U.S. 113, 152, 93 S.Ct. 705, 726, 35 L.Ed.2d 147 (1973). The right to privacy has been defined as being "the right to be left alone." *Olmstead v. United States,* 277 U.S. 438, 478, 48 S.Ct. 564, 572, 72 L.Ed. 944 (1928) (Brandeis, J., dissenting).

■ As a general matter, the right to privacy has been extended to embrace personal decisions involving marriage, procreation, contraception, family relationships, child rearing and education. *Carey v. Population Services International,* 431 U.S. 678, 685, 97 S.Ct. 2010, 2016, 52 L.Ed.2d 675 (1977). This right was extended to certain kinds of private and constitutionally significant conduct occurring in one's own home, see *Stanley v. Georgia,* 394 U.S. 557, 565, 89 S.Ct. 1243, 1248, 22 L.Ed.2d 542 (1969) ("[i]f the First Amendment means anything, it means that a State has no business telling a man, sitting alone in his own house, what books he may read or what films he may watch.").

*Stanley* clearly recognized the difference in the State's ability to punish private consumption of obscene materials and to prohibit public distribution of them, however. Moreover, its rationale, and that of other cases recognizing privacy interests that are deserving of constitutional protection, is limited to rights flowing directly from the text of the constitution (such as the First Amendment rights recognized in *Stanley* ) or other rights either "implicit in the concept of ordered liberty" or "deeply rooted in this Nation's history and tradition," such as the right of private control on child rearing, marriage, or procreation. *See Bowers v. Hardwick,* 478 U.S. 186, 192, 106 S.Ct. 2841, 2844, 92 L.Ed.2d 140 (1986), *quoting Palko v. Connecticut,* 302 U.S. 319, 58 S.Ct. 149, 82 L.Ed. 288 (1937) and *Moore v. East Cleveland,* 431 U.S. 494, 503, 97 S.Ct. 1932, 1937–38, 52 L.Ed.2d 531 (1977) (Opinion of Powell, J.).

■ Plaintiffs have made no showing that choosing to smoke in public or semi-public places is a "privacy right" deserving of special constitutional protection. It is not surprising that the Court's research has not disclosed, and the parties have not cited, any cases extending the right to privacy as far as the right to smoke either in public or in private. However problematic a ban on smoking in the privacy of one's own home might be, the Court is not faced with that question here. The regulations in question, dealing with smoking outside the home, and concerned primarily with the involuntary ingestion of cigarette, pipe or cigar smoke by nonsmokers, do not infringe on plaintiffs' constitutionally-protected privacy interests.

### D. Commerce Clause

The plaintiffs next contend that the regulations impermissibly impair interstate commerce. In support of this argument, they allege that the flow of the cigarette trade will be affected, and that owners of businesses wishing to permit smoking but unable to do so will lose customers.

■ It is certainly true that there is a possibility that fewer cigarettes will be sold in Licking County, because smokers will have fewer places they are permitted to smoke. This is, however, at best an incidental effect on commerce. Almost all health and safety regulations have some incidental effect on commerce. The commerce clause was not intended to prohibit states from legislating on subjects relating to the health, life and safety of their citizens, even though such legislation may indirectly affect commerce. *Huron Portland Cement Co. v. Detroit,* 362 U.S. 440, 442, 80 S.Ct. 813, 815, 4 L.Ed.2d 852 (1960). The Boards have not attempted unduly to burden or discriminate against interstate commerce. All tobacco, homegrown or foreign, is dealt with equally. The mere fact that this might make it more difficult to find a place in which to smoke does not rise to the level of a violation of the commerce clause.

### E. Contract Clause

Finally, the plaintiffs argue that the regulations violate the contract clause in that they materially affect the terms of some contracts of employment. This argument appears to be based upon the plaintiffs' contention that the right to smoke while at work is an im-

plied provision of a number of employment contracts, and that the new regulations would therefore impair the contractual rights of smokers whose workplaces are covered by the smoking ban. The Court will assume, without deciding, that Ohio law would recognize the existence of such an implied contractual term for at least some persons who would be affected by the regulations, and will determine if the regulations' interference with such a term runs afoul of the contract clause.

■ Although the contract clause of the constitution appears absolute on its face (Article I, § 10, declares that "No State shall ... pass any ... Law impairing the obligation of Contracts"), the Supreme Court has long recognized that the right to contract is subject to limitations which the state may impose in the exercise of its police power. *See West Coast Hotel Co. v. Parrish,* 300 U.S. 379, 391, 57 S.Ct. 578, 581–82, 81 L.Ed. 703 (1937); *Allied Structural Steel Co. v. Spannaus,* 438 U.S. 234, 241, 98 S.Ct. 2716, 2720–21, 57 L.Ed.2d 727 (1978) ("it is to be accepted as a commonplace that the Contract Clause does not operate to obliterate the police power of the States."). Drawing upon such decisions as *United States Trust Company v. New Jersey,* 431 U.S. 1, 97 S.Ct. 1505, 52 L.Ed.2d 92 (1977) and *Home Building & Loan Ass'n v. Blaisdell,* 290 U.S. 398, 54 S.Ct. 231, 78 L.Ed. 413 (1934), the Court in *Allied* concluded that a multi-factor inquiry that focuses both on the substantiality of the contractual impairment alleged, and the type of societal interest addressed by the statute in question, was appropriate.

■ The first inquiry is whether the challenged regulations constitute a substantial or material change to some previously-vested contract right. If not, further analysis is unnecessary; "[m]inimal alteration of contractual obligations may end the inquiry at its first stage." *Allied,* 438 U.S. at 245, 98 S.Ct. at 2723. Although the regulations may restrict the places where employees may smoke, those restrictions are not absolute, do not appear to extend to unenclosed places ("work area" is defined as a "room, desk, station or other area"), and allow employers to provide designated areas for smoking. It

is very difficult to characterize this type of regulation as more than a minimal alteration of an employment contract, especially when the term that is purportedly impaired is, at best, an implied term having little to do with the basic features of an employment contract, such as job duties, compensation, benefits, or general working conditions.

■ Even if the regulations impose more than a minimal change to employment contracts, however, they are typical of legislation that addresses generalized and legitimate public concerns. The purpose of the regulations is to further public health. They were adopted only after specific findings of a health hazard were made. They are not directed at any particular class of employers, but are general in their application. They reflect an awareness of the competing interests of smokers and nonsmokers, and provide for exceptions, variances, and other means of accommodating smokers. In short, they appear to be sufficiently related to the state's legitimate interests in the health of its citizens, and sufficiently tailored to meet those interests, so as to be valid under the contract clause.

### F. Delegation of Police Powers and Separation of Powers

All of the above discussion has been based upon one underlying assumption—that the Boards had the authority under state law to pass the regulations at issue in this case. The plaintiffs do not concede this point, however, but argue that the Boards exceeded the statutory authority given to them by Ohio Rev.Code §§ 3709.20 and 3709.21 when they adopted these regulations. The plaintiffs also allege that the Boards failed to comply with various notice and publication provisions of the same statutes. Finally, they claim that this exercise of legislative-type authority by an administrative body violates the separation of powers doctrine.

■ All of these remaining claims arise under Ohio law. Plaintiffs have made this explicit with respect to their enactment procedure claim:

"Defendants are mistaken in their assertion that Plaintiff's (sic) claims relating to

the enactment procedure arise under federal law. Those claims set forth in Plaintiff's (sic) Complaint are pendant state claims arising state law and have no relationship whatsoever to Plaintiff's (sic) claims under 42 U.S.C. Section 1983 or the United States Constitution." Plaintiffs' Memorandum Contra, at 4.

The same conclusion must be reached with respect to their separation of powers claim, even though plaintiffs make reference to federal law in their discussion of this issue. The United States Constitution acts as a restriction on *Congress'* ability to delegate the legislative function to other branches of government. *See, e.g., Mistretta v. United States,* 488 U.S. 361, 372, 109 S.Ct. 647, 654–55, 102 L.Ed.2d 714 (1989) (our tripartite system of government "mandate[s] that Congress generally cannot delegate its legislative power to another Branch."). The Ohio Constitution implies a similar restriction applicable to Ohio governmental bodies. *See City of South Euclid v. Jemison,* 28 Ohio St.3d 157, 159, 503 N.E.2d 136 (1986) ("This doctrine is implicitly embedded in the entire framework of those sections of the Ohio Constitution that define the substance and scope of powers granted to the three branches of government"); *see also Ohio ex rel. Bryant v. Akron Metropolitan Park District,* 281 U.S. 74, 79, 50 S.Ct. 228, 230, 74 L.Ed. 710 (1930), *aff'g* 120 Ohio St. 464, 166 N.E. 407 (1929) (no "substantial Federal question [is] presented" by a claim of delegation of legislative power in violation of the Ohio Constitution).

 Given that the Court has found all plaintiffs' federal claims to be without merit, it would be unwise to exercise supplemental jurisdiction over these claims. *See* 28 U.S.C. § 1367(c)(1) and (3), which permit the Court to decline to exercise supplemental jurisdiction over state law claims if "the claim raises a novel or complex issue of State law" or if "the district court has dismissed all claims over which it has original jurisdiction...." *Cf. Province v. Cleveland Press Pub. Co.,* 787 F.2d 1047 (6th Cir.1986). Both of these statutory provisions apply here. Consequently, these claims will be dismissed without prejudice.

## IV.

For the reasons set forth above, the Court orders the following:

1. The defendants' motion to dismiss is **GRANTED**. The plaintiffs' federal constitutional claims are **DISMISSED WITH PREJUDICE**. The state law claims are **DISMISSED WITHOUT PREJUDICE**.

2. The Clerk shall enter judgment in favor of the defendants and terminate this case.