Harold L. HATCHER, Plaintiff,

v.

GREATER CLEVELAND REGIONAL TRANSIT AUTHORITY, Defendant.

Civ. A. No. C88–0255.

United States District Court, N.D. Ohio, E.D.

Oct. 3, 1989.

Dennis J. Niermann, Kramer & Toboc-man Co., Cleveland, Ohio, for plaintiff.

Oscar Trivers, Janice M. Wood and Thomas H. Barnard, Thomas J. Wiencek, Duvin, Cahn & Barnard, Cleveland, Ohio, for defendant.

## MEMORANDUM AND ORDER

ANN ALDRICH, District Judge.

Harold Hatcher, an African–American, sues his former employer, the Greater

Cleveland Regional Transit Authority ("the RTA") for racial discrimination based on the RTA's summary termination of Hatcher from his position as a transit police officer. Hatcher asserts race discrimination claims pursuant to 42 U.S.C. § 2000e–2 ("Title VII"), under both disparate treatment and disparate impact theories, and 42 U.S.C. § 1981. He further contends, pursuant to 42 U.S.C. § 1983, that by treating him in a disfavored manner because of his race, the RTA violated his fourteenth amendment right to equal protection, and that by dismissing him both summarily and on meager grounds the RTA violated his fifth and fourteenth amendment rights to due process. Hatcher seeks declaratory and injunctive relief, compensatory and punitive damages, reinstatement with backpay and benefits, plus interest, attorneys fees and costs.

In its motion for summary judgment, the RTA responds that it fired Hatcher for legitimate, non-race-based reasons, and that Hatcher has come forward with nothing to show either racially-biased intent on the part of the RTA, or that the RTA's employment policies have a racially disparate impact. It contends further that Hatcher cannot establish, as he must under the law of this circuit, that the RTA's proffered reasons were pretextual. In addition, it asserts that the § 1981 claim fails because it involves termination of employment, as opposed to the making or the enforcement of a contract, and that the equal protection claim fails for lack of a class-based rule or policy. The RTA addresses Hatcher's due process claim in a supplemental motion, stating that, as a probationary employee, Hatcher can claim procedural rights under neither the RTA employment policies nor under the Constitution.

Upon consideration and for the reasons that follow, the Court grants the RTA's motion and enters summary judgment in its favor.

## I.

The material facts are not disputed. With a background that included many years in law enforcement, Harold Hatcher was hired by the RTA on October 16, 1986, subject to a six month probationary period. As a probationary employee, Hatcher's status with the RTA was governed by Section 7.5 of the Merit System Rule for the Cleveland Transit System, which provides:

> *Probation:* All original and promotional appointments shall be for a probationary period of not to exceed six months and no appointment or promotion shall be deemed finally made until the appointee has satisfactorily served his probationary period. At any time before the end of the probationary period, the Appointing Authority shall transmit to the Personnel Director a record of the employee's service and if such service has been unsatisfactory, the employee may, with the approval of the Personnel Director be removed or reduced without restriction....

On January 23, 1987, while working on the train platform at the Terminal Tower station, Hatcher engaged in a heated argument with one of his co-workers—Philip Douglas, who is also black. Hatcher claims that Douglas was responsible for the rapid escalation in the noise level and the harshness of the language used by both men. Both admit, however, to the escalation and to the use of profanity.

Following this incident, both men were instructed by their supervisors, Patrolmen Narducci and Kassay, to write up reports for then Security Director Creed Williams. Patrolmen Narducci and Kassay, who are both white, filed two reports on the incident. In their first report, they stressed the public nature of the quarrel:

> An argument ensued between Hatcher and Douglas which became loud and the object of attention of the passengers, and other RTA employees on the platform. The argument deteriorated to the use of foul and obscene language with the officers calling one another "black mother fuckers" among other names.

RTA's Ex. 161 at 4. In their second report, Narducci and Kassay wrote that:

> On 1–26–87 Ptl. Hatcher and Douglas each were called in to write a report concerning their conduct on 1–23–87 ...

As you can see each officers [sic] statement is very vague and evasive ...

In Officer Hatcher's case this incident coupled with our other investigation of him, should be grounds for dismissal. In Officer Douglas's case, this is his second reprimand. He has shown inability to adapt to a disciplined regimen of police work. Suspension should be mandatory, with a close look given to dismissal.

RTA's Ex. 161 at 5. On January 31, 1987, Hatcher sent a letter to Director Williams recounting the history of his problems with Douglas, explaining in more detail the events of January 23, 1987, and stating that he intended to resign. RTA Ex. 29–C.

It is not clear what prompted the RTA to attempt to verify the information supplied in Hatcher's employment application; however, the RTA reports that the check yielded "several apparent inconsistencies." RTA Memo. at 6. In addition, although it is not clear when the RTA gathered this information, the RTA also discovered that Hatcher had been refused employment by the City of Cleveland police department, and had twice in the past been indicted—although not convicted—for serious crimes.

On February 2, 1987, without prior warning, Personnel Director Robert James, who is also black, summoned Hatcher into his office and informed him that he was being terminated. According to Hatcher, James told him, without offering him an opportunity to present his side of the story, that the discharge was for submitting false information on his job application, to wit: a false social security number and birth date, and the omission of a 1981 conviction for violating a Cleveland noise ordinance. Hatcher claims that James then inquired whether the City of Cleveland had rejected Hatcher's application to be a city police officer, and that he had told James that this was true and had been due to his age.

In a memorandum of the same date as Hatcher's discharge, the late Director Williams, who was also black, made the following recommendation:

In addition to the false statements regarding age, social security number and criminal conviction, it has recently been noted that the subject was turned down by the Cleveland Police Department. He has also *showed poor judgment in actions related to his position and been the cause of several complaints by fellow officers.*

Based on the facts herein, I respectfully recommend discharge under the provisions of Merit System Rule, 7.5.

The following charges are preferred:

14.2

(g) Conduct unbecoming an employee either on or off duty, such as will bring the service in disrepute.

(h) Wilful or repeated violation of any of these rules.

(o) Other failures of good behavior detrimental to the service.

(r) False statements, fraud or deception on the employees application for employment of [sic] application for promotional examination.

Transit Police Rule 7.1

A member of the force must be quite, civil, orderly and moral in conduct, character, and habits, both official and private.

Hatcher Ex. O (emphasis added).

On February 2, 1987, Hatcher filed complaints of race discrimination with both the Ohio Civil Rights Commission ("the OCRC") and with the Equal Employment Opportunity Commission ("the EEOC"). On February 4, 1987, he addressed a letter to George Abram, the RTA affirmative action officer, with documentation showing that the social security number and birthdate listed on his application were correct, and stating that:

The verbal confrontation with Officer Douglas was merely a brief somewhat heated exchange of words. The argument occured on a Red Line transit platform witnessed only by Officer Harold Thompson. No one, other than the three of us, was present at the time. This act did not in any way damage the reputation of myself, Douglas, the GCRTA Po-

lice Department or the Greater Cleveland Regional Transit Authority.

RTA's Ex. 189 at 2.

Responding to Hatcher's discrimination complaints, Personnel Administrator Bettye J. Ware reported in a memorandum to Zaida Torres, Business Enterprise Officer, dated March 3, 1987, that although James had cited the January 23rd incident as "conduct unbecoming an employee," he did not consider this "the main issue of discharge." Hatcher Ex. M. That same date, Williams addressed the following explanation to Torres:

> ... Mr. Hatcher was terminated for falsifying his employment application and for various merit rule violations. His argument with Mr. Douglas was only one incident [which] when compounded with other more serious infractions such as falsifying his employment application resulted in his discharge.

Hatcher Ex. N.

In November of 1987, the RTA replaced Hatcher with Steven Donaldson, a white man who, prior to applying to the RTA, had been employed by Warrensville Township as a police officer. Although Donaldson, like Hatcher, stated on his application that he had never been "convicted of any violation of law, other than traffic," he had in fact pled no contest to a charge of discharging a firearm from a motor vehicle. The record of this conviction was later expunged and, when this conviction record came to Williams' attention, Donaldson was retained by the RTA. Similarly, Lou Narducci, also white, was hired and retained by the RTA despite having been arrested and indicted for "double-dipping," a charge which had led to his resignation from the Shaker Heights Police force. Williams and others at the RTA were aware of and discussed this charge with Narducci in his initial interview.

Following his receipt of a "right to sue" letter from the EEOC dated December 3, 1987, Hatcher timely filed this suit on January 28, 1988.

## II.

The RTA has moved for summary judgment pursuant to Federal Rule of Civil Procedure 56, which provides:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law ...

Fed.R.Civ.P. 56(c). The nature of the materials properly presented in a summary judgment pleading is set forth in Rule 56(e):

> Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein ... The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits. When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Moreover, the moving party need not submit evidence negating a claim on which its opponent bears the burden of proof; and the moving party may rely upon the adverse party's failure to substantiate such essential claim with admissible evidence. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In reviewing summary judgment motions, this Court must view the evidence in the light most favorable to the non-moving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Hasan v. CleveTrust*

*Realty Investors, Inc.,* 729 F.2d 372 (6th Cir.1984). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. *Id.* Thus, in most civil trials the Court must decide "whether [a] reasonable [finder of fact] could find by a preponderance of the evidence that the [nonmoving party] is entitled to a verdict." *Id.* at 252, 106 S.Ct. at 2512. Although "[t]he mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient" to defeat a summary judgment motion, the Court is not precluded from denying the motion where it concludes that proceeding to trial is a better course. *Id.* at 252, 254, 106 S.Ct. at 2512, 2513.

### III.

#### A. Title VII

Hatcher invokes the discriminatory discharge provision of Title VII, 42 U.S.C. § 2000e–2, which provides in part:

(a) It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual ... because of such individual's race, color, religion, sex, or national origin ...

The Supreme Court has articulated two theories by which a plaintiff can prove racial discrimination under Title VII—disparate treatment, *McDonnell Douglas v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and disparate impact. *Griggs v. Duke Power Co.,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). *See Rowe v. Cleveland Pneumatic Co.,* 690 F.2d 88, 92 (6th Cir.1982). If an employer has treated members of different races differently, then the plaintiff must show that this "disparate treatment" can be attributed to race. *McDonnell Douglas v. Green,* 411 U.S. at 805 n. 18, 93 S.Ct. at 1825 n. 18. *See also U.S. Postal Service Bd. of Governors v. Aikens,* 460 U.S. 711, 715, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983). A dis-

parate impact analysis, on the other hand, is applied to employment policies or practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another. *Watson v. Fort Worth Bank and Trust,* 487 U.S. 977, 108 S.Ct. 2777, 2784, 101 L.Ed.2d 827 (1988); *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1849 n. 15, 52 L.Ed.2d 396 (1977). Hatcher's complaint includes claims under both theories, which will be considered in turn.

#### 1. Disparate treatment

■ Under *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973), a plaintiff must show that the racially-suspect "disparate treatment" was the product of intentional racial discrimination. This can be done with either direct or indirect evidence. *U.S. Postal Service v. Aikens,* 460 U.S. 711, 714 n. 3, 103 S.Ct. 1478, 1481 n. 3, 75 L.Ed.2d 403 (1983); *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). In cases where a plaintiff relies on indirect or circumstantial evidence, an inference of intentional discrimination is created when a plaintiff presents the required *prima facie* case, because "we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors." *Furnco Construction Corp. v. Waters,* 438 U.S. 567, 577, 98 S.Ct. 2943, 2950–51, 57 L.Ed.2d 957 (1978). A plaintiff, like Harold Hatcher, can establish a *prima facie* case that his termination was discriminatory by showing the following:

(i) that he belongs to a protected Title VII classification; (ii) that he was qualified for the position from which he was discharged; (iii) that, despite his qualifications, he was discharged; and (iv) that, subsequent to his discharge, he was replaced by a white.

*Becton v. Detroit Terminal of Consolidated Freightways,* 687 F.2d 140, 141 (6th

Cir.1982), *cert. denied,* 460 U.S. 1040, 103 S.Ct. 1432, 75 L.Ed.2d 791 (1983).

■ When a plaintiff has made this showing, the inference created shifts to the defendant the burden to go forward and "to articulate some legitimate, nondiscriminatory reason for the employee's [termination]." *McDonnell Douglas Corp.,* 411 U.S. at 802, 93 S.Ct. at 1824. The defendant need not, however, demonstrate that it was in fact motivated by the proffered reason; it successfully rebuts the inference of discrimination if it merely shows, with admissible evidence, the existence of an alternative, legitimate explanation for its conduct. *Burdine,* 450 U.S. at 254, 101 S.Ct. at 1094; *Board of Trustees of Keene State College v. Sweeney,* 439 U.S. 24, 25, 99 S.Ct. 295, 295–296, 58 L.Ed.2d 216 (1978). If the defendant does produce such an explanation, the presumption is rebutted, and the analysis focuses on the elusive question of the employer's motivation.

■ This shift in the burden of *production* must not be confused with the burden of *persuasion* on the issue of discrimination, which rests at all times with the plaintiff:

> The plaintiff retains the burden of persuasion. [He] now must have the opportunity to demonstrate that the proffered reason was not the true reason for the employment decision. This burden now merges with the ultimate burden of persuading the court that [he] has been the victim of intentional discrimination. [He] may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.

*Burdine,* 450 U.S. at 255–56, 101 S.Ct. at 1094–95, citing *McDonnell Douglas,* 411 U.S. at 804–05, 93 S.Ct. at 1825–26. As the rule has been stated in the Sixth Circuit Court of Appeals, the plaintiff who proves discrimination by showing that the articulated reason is pretextual is persuading the factfinder to draw an inference:

> [I]t is not merely the falsity or incorrectness of the articulated reason that gives rise to the conclusion of pretext. Rather, it is the resulting absence of legitimate explanation for the suspect employment decision that warrants the finding of discrimination.

*Sims v. Cleland,* 813 F.2d 790, 793 (6th Cir.1987). Accordingly, this method of persuasion requires that the plaintiff rebut all of the articulated nondiscriminatory reasons for the discharge in order to demonstrate the lack of legitimate motivation which suggests discrimination. As the Court of Appeals has explained, "[w]here two or more alternative and independent legitimate, nondiscriminatory reasons are articulated by the defendant employer, the falsity or incorrectness of one may not impeach the credibility of the remaining articulated reason(s)." *Sims v. Cleland,* 813 F.2d at 793.

■ Hatcher does not present any direct evidence that his race influenced the RTA's decision to end his employment. Although he alleged in his complaint that Williams' determination that he "would not make a police officer" was racially-biased, he did not restate, let alone support, that allegation in his memorandum opposing the RTA's motion. Instead, he seeks to prove race discrimination with indirect evidence, in part by asserting that his dismissal was unjustified and also through comparisons with various other transit officers. With respect to his *prima facie* case, there is no dispute that he is a member of a protected group and that he was fired. He attempts to establish the third essential factor, that he was qualified for the position, with evidence of his past law enforcement training and letters of commendation. Assuming *arguendo* that Hatcher's training rendered him qualified, an inference of discrimination is created by the fact that Hatcher was replaced by a white person and the burden of production shifts to the RTA.

The RTA responds that it discharged Hatcher based on his conduct—engaging in a loud, obscene argument with another officer in public, and submission of what appeared to be inaccurate information on his application. It asserts that, on a plain reading of the RTA policies, such conduct,

especially by a probationary employee, constitutes sufficient, and nondiscriminatory, cause for termination. Thus, the RTA destroys the presumption of discrimination, and returns to Hatcher the burden of proving that these justifications were pretexts for racism. Because the RTA has proffered two nondiscriminatory bases for firing him, Hatcher must disprove both of them before the fact-finder may infer discrimination. As will be discussed, his attempts to do this do not succeed.

Regarding the alleged inaccuracy of his application, Hatcher asserts that the issues of concern were both trivial and unfounded, and that the "rumors" of past criminal conduct were similarly unsubstantiated. He argues that these reasons should be seen as pretextual because the RTA ignored his proof that he had provided accurate information. In addition, he asserts that they are unworthy of credence and in fact reveal racial bias because the RTA permitted similarly situated white officers to engage without penalty in the conduct for which he was allegedly terminated. For example, he was purportedly fired for concealing a "conviction," more properly termed a citation, under a noise ordinance. Yet, Williams and James permitted Donaldson and Narducci to continue to serve as transit officers, despite their having omitted serious criminal offenses from their applications—respectively, a crime of violence (discharging a firearm from a motor vehicle) and one of dishonesty (drawing two salaries simultaneously). Thus, Hatcher contends that these purported grounds for his dismissal must be seen as pretextual.

The RTA asserts to the contrary that Donaldson and Narducci were not similarly situated because, irrespective of how the prior misconduct came to light, Williams and James had the opportunity to discuss these incidents with them in their initial interviews, and to consider the information throughout their probationary periods. With Hatcher, on the other hand, not only was the prior misconduct not revealed initially, but, as evidenced by his supervisors' mention of the "evasiveness" of his initial report of the January 23rd incident, his lack of forthrightness continued to be of concern. However, the Court need not at this point resolve whether Hatcher, Donaldson and Narducci were similarly situated with respect to honesty about illegal or improper conduct. Under *Sims v. Cleland*, 813 F.2d at 790, Hatcher must produce probative evidence disproving both of the RTA's proffered justifications in order to survive the motion for summary judgment. Thus, the Court will turn to Hatcher's attempt to refute the RTA's claimed concern about the Hatcher–Douglas altercation.

Regarding the altercation, Hatcher claimed in his letter to George Abram, that "[n]o one, other than [the three officers on duty], was present." RTA Ex. 189. He asserts that, without witnesses, the argument could not have brought "the service into disrepute," and thus should not be considered a violation of Merit Rule 14.2(g). He adds, with respect to Merit Rule 14.2(h) ("wilful ... violation"), that it was not his fault. He argues further, as with the concealment of prior "convictions," that the RTA's professed concern about the argument should be seen as pretextual because the RTA did not sanction white officers who engaged in the same conduct. Hatcher thus contends in essence that either the RTA did not base its decision on the verbal altercation, in which case the reason is pretextual, or it did rely on the verbal altercation, in which case it subjected Hatcher to differential treatment. He cites, for example, white transit officers Narducci, Kassay, and Drew, who were not fired, nor even disciplined, after their loud profane arguments with Douglas. Berry Affidavit, Hatcher Ex. S.

Regarding Hatcher's claim that the fight was not witnessed, the RTA has introduced evidence that contradicts Hatcher. The dispute is not, however, a material one. For even if it were to be assumed that Hatcher's version is accurate, and that the platform was devoid of passengers, the RTA's distinction between "public" and "private" is plainly a valid one. The merit rules do not require that an employee actually cause a scandal before that employee may be discharged. Rather, they require

merely that the conduct be "such as *will* bring the service into disrepute;" that is, it will do so if allowed to continue. Similarly, the prohibition against "failures of good behavior" is simply a command that RTA employees comport themselves appropriately; as written, it is unmodified by any qualifications that such "failures" be witnessed by members of the public or otherwise deliver a specified quantum of embarrassment. In its rules, the RTA unmistakably reserves the right to sanction an employee, including suspension or discharge, for such conduct *before* a scandal occurs.

To the allegation of disparate treatment between Hatcher, Donaldson and Narducci, the RTA responds again that the white officers were not "situated similarly" to Hatcher in that they did not engage in such conduct *in public*. Rather, the RTA points out, and Hatcher does not dispute, that these alleged arguments took place on private property. Although it need not do so under *McDonnell Douglas, see Cooper v. City of North Olmsted*, 795 F.2d 1265, 1270 (6th Cir.1986), the RTA goes further and explains that this distinction mirrors its own rules, which provide that discharge or suspension may be premised, for example, upon "[c]onduct ... such as will bring the service into disrepute" and "failures of good behavior detrimental to the service." Merit System Rules at 18, RTA Ex. 159.

Hatcher does not dispute the validity of these rules, or that he was subject to them. To the extent that he complains that the RTA fails to enforce these rules evenhandedly, he does not state a claim cognizable under Title VII without showing racial-bias; this statute offers employees no protection against bad business judgment or caprice. *Furnco*, 438 U.S. at 577–78, 98 S.Ct. at 2949–50. Although he attempts to make such a showing by comparing himself to Narducci, Kassay and Drew, the RTA's failure to discipline these white officers cannot support his disparate treatment claim because they were not "similarly situated." Moreover, his understandable indignation at the preferential treatment af-

forded Douglas is not actionable under Title VII because both men are of the same race. Hatcher thus fails to disprove reliance on the altercation based on either the RTA rules or a racially-biased enforcement pattern.

Citing *EEOC v. Aeronca, Inc.*, 31 E.P.D. ¶ 33,369 (S.D.Ohio 1983), Hatcher attempts to avoid the conclusion dictated by *Sims v. Cleland*. He contends that, even if the public argument would have been a legitimate basis for terminating him, it was not in fact the reason for his discharge. He argues that the RTA's internal memoranda demonstrate that, at the time of the discharge, the RTA placed less emphasis upon the argument than on his application and other concerns. The current focus upon the altercation, he asserts, is recent and contrived for the purpose of this lawsuit.

While this argument is not entirely implausible, it fails for two reasons. First, *Aeronca* is readily distinguishable from the present case. Unlike the *Aeronca* defendant that first stated its concern with the plaintiff's abilities on the eve of trial, the RTA interoffice memoranda and James' statements when discharging Hatcher (as recounted by Hatcher himself), as well as the more recent deposition testimony, show that the RTA and its agents were concerned about Hatcher's fight with Douglas throughout the consideration of Hatcher's case. Further, based on the timing of the relevant events, the RTA's verification of Hatcher's application was obviously prompted at least in some measure by the fight. Hatcher simply cannot protest that this issue came from the blue on the eve of trial. Hatcher contends nevertheless that the RTA is now placing a greater weight on the fight than it did when it decided to fire him. That may be true. If *Aeronca* were to be read to invalidate such a shifting of emphasis, however, it would plainly contradict the requirement that "[t]he defendant need not persuade the court that it was actually motivated by the proffered reasons." *Burdine*, 450 U.S. at 254, 101 S.Ct. at 1094.[1]

1. Given that *Burdine* does not permit the conclusion Hatcher urges from these RTA memo-

randa, the Court need not rule upon the RTA's

Hatcher bears the burden of producing probative evidence that the RTA's stated concern with the vulgar public altercation was pretextual. He has not done so. Under *Sims v. Cleland*, the factfinder cannot infer discrimination if there remains a valid, nondiscriminatory reason for its action, articulated by the defendant and unrebutted by the plaintiff. Because Hatcher has failed to carry his burden, the RTA's motion for summary judgment must be granted on the Title VII disparate treatment claim.

### 2. *Disparate impact*

 Also under Title VII, Hatcher alleges that the RTA's personnel policies, and specifically the discharge policies, have an impermissible disparate impact on blacks. To prevail on an impact theory, in contrast to a disparate treatment theory, a plaintiff need not show discriminatory intent, but instead that a facially neutral employment practice operates disproportionately in fact to the detriment of members of a protected group. *Watson v. Fort Worth Bank and Trust*, 487 U.S. 977, 108 S.Ct. 2777, 101 L.Ed.2d 827 (1988).

In assessing adverse impact, the Court is guided by the Sixth Circuit's decision in *Kent County Sheriff's Association v. County of Kent*, 826 F.2d 1485 (1987). In comparing the burdens of proof required in the two types of cases, the Court of Appeals said:

> In disparate (adverse) impact cases, the burden of proof shifts between the parties, starting with the plaintiff, and a somewhat similar tripartite analysis is employed: (1) the plaintiff must establish a substantial adverse impact on a protected class, (2) the employer must prove a business necessity for the practice

(e.g., job-relatedness of the challenged requirement), and (3) the plaintiff must then prove that other acceptable requirements with less adverse impact exist.

*Id.* at 11, *citing* B. Schei & P. Grossman, *Employment Discrimination in Law* 1287; *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 425, 95 S.Ct. 2362, 2375, 45 L.Ed.2d 280 (1975); *Griggs v. Duke Power*, 401 U.S. 424, 429–30, 91 S.Ct. 849, 852–53, 28 L.Ed.2d 158 (1971). Moreover, as the Supreme Court recently explained, "[t]he evidence in these 'disparate impact' cases usually focuses on statistical disparities, rather than specific incidents, and on competing explanations for those disparities." *Watson*, 108 S.Ct. at 2784–85.

The RTA asserts that on this claim, like the "treatment" claim, Hatcher has come forward with nothing to substantiate the sweeping allegation in his complaint. The RTA notes further that in *Watson*, with its holding that subjective or discretionary employment practices may be challenged using disparate impact analysis, the Supreme Court also restated the requirement that— to invalidate employment practices based on their disparate impact—a plaintiff must identify alternative practices that would serve the employer's legitimate purposes without the racially-infirm consequences. *Id.* The RTA contends that there has been no showing—statistical or otherwise—of suspect policies, and further that Hatcher has failed to satisfy the *Watson* requirement that he identify alternative practices that would serve the RTA's legitimate purposes without the allegedly infirm consequences. The Court finds both of these points to be well-taken. The RTA must be granted summary judgment on Hatcher's disparate impact claim as well.

---

hearsay objection to the March 3, 1987 Torres memorandum (Hatcher Ex.M).

In addition, regarding application of the *Burdine* standards, the fact that Williams, James and the other RTA decisionmakers may have had multiple and mixed concerns about Hatcher, with an unspecified or shifting emphasis among them, does not transform this case from a "pretext" case into a "mixed motive" case. A plaintiff who has produced no direct evidence, may rely on an inference of discrimination only

because "we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors." *Furnco*, 438 U.S. at 577, 98 S.Ct. at 2949–50. If the defendant suggests at least one plausible nondiscriminatory motive that stands unrefuted, it need not identify and persuade with respect to its true motives. *Compare Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989).

### B. 42 U.S.C. § 1981

■ Hatcher claims that the RTA's decision to fire him, allegedly infected with racial bias, violated rights secured to him by the Civil Rights Act of 1870, codified at 42 U.S.C. § 1981. This statute provides:

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

Subsequent to the filing of his complaint, however, the United States Supreme Court rendered its decision in *Patterson v. McLean Credit Union*, —— U.S. ——, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989). Where courts had previously interpreted this statute as paralleling Title VII, so as to apply not only to hiring, but also to discrimination with respect to the "compensation, terms, conditions or privileges of employment," *see generally Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), the *Patterson* decision restricted application of this statute to its explicitly stated scope, to wit: racially motivated refusals to form contracts and interference with efforts to obtain enforcement of contractual rights, for example, by suit in a state court. Based on the *Patterson* decision, the RTA has moved for summary judgment on Hatcher's § 1981 claim. Hatcher has not opposed this motion. Accordingly, and because the RTA's reasoning is plainly correct, the motion will be granted on this claim.

### C. 42 U.S.C. § 1983

Hatcher has alleged that, by treating him in a racially-biased manner and by discharging him summarily and without prior notice and an opportunity to be heard, the RTA—a quasi-public entity—violated his constitutional rights to equal protection and due process. He sues pursuant to title 42 U.S.C. § 1983, which provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

According to the Sixth Circuit Court of Appeals, "[t]wo essential elements must be pled and proven by a plaintiff to recover under [§]1983." *Dunn v. State of Tennessee*, 697 F.2d 121, 125 (6th Cir.1982), *cert. denied*, 460 U.S. 1086, 103 S.Ct. 1778, 76 L.Ed.2d 349 (1983). First, there must be a deprivation of plaintiff's "rights, privileges, or immunities secured by the Constitution and laws" of the United States. *Baker v. McCollan*, 443 U.S. 137, 140, 99 S.Ct. 2689, 2692, 61 L.Ed.2d 433 (1979). Second, the plaintiff must allege that the defendants deprived [him] of this constitutional right "under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory." *Monroe v. Pape*, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961). Regarding the first element, Hatcher claims that the RTA violated his federal constitutional rights to equal protection and due process. These rights will be considered in turn.

#### 1. *Equal protection*

■ The crux of an equal protection claim is that "all persons similarly situated shall be treated alike." *F.S. Royster Guano Co. v. Virginia*, 253 U.S. 412, 40 S.Ct. 560, 64 L.Ed. 989 (1920). An elementary prerequisite to equal protection analysis, however, is that there be a legislative or administrative scheme or state-promulgated rule which is subject to judicial review. *Parham v. Hughes*, 441 U.S. 347, 99 S.Ct. 1742, 60 L.Ed.2d 269 (1979); *Konigsberg v. State Bar of California*, 366 U.S. 36, 81 S.Ct. 997, 6 L.Ed.2d 105 (1961); *Salibra v. Supreme Court of Ohio*, 730 F.2d 1059, 1062 n. 5 (6th Cir.), *cert. denied*, 469 U.S. 917, 105 S.Ct. 295, 83 L.Ed.2d 230

(1984). As the United States Supreme Court has stated unequivocally, "[t]he Equal Protection Clause was intended as a restriction on *state legislative action* inconsistent with elemental constitutional principles." *Plyler v. Doe*, 457 U.S. 202, 216, 102 S.Ct. 2382, 2394, 72 L.Ed.2d 786 (Tex.1982) (emphasis added). A statute or official state policy which arbitrarily subjects certain groups of employees, such as blacks or women, to disfavored treatment is subject to an equal protection challenge. Because Hatcher undertakes no criticism of the Ohio statutes governing the RTA, or the internal rules by which it is administered, and simply challenges the *ad hoc* actions taken by these defendants against him personally, the equal protection clause is a wholly improper vehicle for his complaints. Accordingly, summary judgment must be granted in favor of the RTA on Hatcher's equal protection claim.

### 2. *Due process*

■ Hatcher alleges in his complaint that he received neither notice nor a fair opportunity to be heard prior to his abrupt termination on February 2, 1987, and that he was thus denied the due process guaranteed him under the Constitution. In his initial brief in opposition to the motion for summary judgment, Hatcher simply asserts without elaboration that he was not afforded a proper pretermination hearing. The RTA then moved for summary judgment on the alternative grounds that, as a probationary employee, Hatcher was not entitled to constitutional protection, and, if the Court were to find that procedural due process was required, the interview afforded Hatcher at the time of his termination more than satisfied the relevant standard. Hatcher has not responded to the RTA's motion.

The Supreme Court, in *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985), recognized with the following reasoning that the due process clause affords a measure of protection to the property interest of public employees who enjoy an expectation of continued employment:

While the legislature may elect not to confer a property interest in [public] employment, it may not constitutionally authorize the deprivation of such an interest, once conferred, without appropriate procedural safeguards.

*Id.* at 541, 105 S.Ct. at 1493. Thus the threshold question here, before the question of what procedural safeguards pertain, is whether the law and regulations governing the RTA and its employees had conferred on Hatcher an interest in, or expectation of, continued employment.

Upon review of the RTA's policies, and Merit Rule 7.5 in particular, the answer to this threshhold question emerges plainly: probationary employees have no expectation of continued employment and are not entitled to the procedural protections set forth in those policies. Per force, *Loudermill* does not apply.

Hatcher attempts an alternate reading of these policies. He draws the Court's attention to Director Williams' statement that "Mr. Douglas and Mr. Hatcher were reprimanded for their conduct." Hatcher Ex. N. He then attempts to expand this simple and undisputed factual recounting into a declaration of RTA policy. He contends that Williams' statement "clearly establishes that at the time of the discharge, the Director of Security and the head of personnel for RTA, Mr. James, both knew full well that one heated argument between RTA police was, at best, only cause for reprimand, not discharge." Hatcher Memorandum at 12. However, Williams' description of these events is in no way probative of what Williams and James "knew" with respect to RTA policy. Moreover, the interpretation Hatcher proposes would contradict directly item 14.2(g) of the merit rules, which states that "conduct unbecoming an employee either on or off duty," standing alone, can constitute grounds for discharge.

Because it is undisputed that Hatcher was still on probation when he was fired, the Court finds that Hatcher has no due process claim under *Loudermill*. Thus the Court need not consider whether the meeting between James and Hatcher, and their

discussion of the reasons for the termination, constituted an adequate pretermination hearing under *Loudermill*.[2] The RTA must be granted summary judgment on Hatcher's due process claim.[3]

## IV.

Under Title VII, 42 U.S.C. § 2000e–2, Hatcher claims that he was the victim of racially-biased disparate treatment. Yet, he produced no direct evidence to substantiate this claim. In response to his circumstantial evidence that the RTA treated him unfairly based upon his race, the RTA articulated two nondiscriminatory reasons for discharging him. Although the finder of fact might conclude that Hatcher submitted probative evidence to disprove the RTA's asserted concern about alleged inaccuracies on his employment application, Hatcher did not produce similar evidence to establish as pretextual the RTA's stated concern with the manner in which its employees comport themselves in public. Hatcher has therefore not carried his burden of producing evidence to show, by inference, racially discriminatory intent on the part of the RTA or its agents. Accordingly, the RTA is entitled as a matter of law to summary judgment on Hatcher's Title VII disparate treatment claim.

Further, Hatcher has produced no evidence to support his claim that the RTA's employment practices and/or policies have a racially disparate impact. And he has certainly not demonstrated the existence of feasible alternative policies which would avoid such impact. Therefore, the Court grants the RTA summary judgment on Hatcher's disparate impact claim as well.

The RTA has moved for summary judgment on Hatcher's § 1981 claim because it does not involve the "making or enforce-

ment" of a contract. Hatcher does not oppose this motion. Therefore, and as mandated by this new standard, the RTA's motion is granted on this claim.

Because individual persons were responsible for the treatment Hatcher complains of, and such treatment affected him as an individual, and because he challenges no statute or generally applicable governmental policy, the Court grants summary judgment in favor of the RTA on the equal protection claim.

Because Hatcher, a probationary employee, had no expectation of continued employment, Hatcher's due process claim fails and the RTA's motion for summary judgment on that claim is also granted.

IT IS SO ORDERED.

---

**2.** Were the Court to reach and consider the adequacy of the hearing, however, Hatcher would have to surmount the barrier he created for himself with his January 31 letter to Williams in which, prior to the allegedly unfair meeting with James, he tendered his resignation. RTA Ex. 29–C. It is not clear from the evidence submitted on the present motions whether James was aware of this letter when he discharged Hatcher. In any case, however, the

resignation does weaken still further an already tenuous due process claim.

**3.** Having found both the equal protection claim and the due process claim to be deficient, the Court need not address whether the RTA and its agents were sufficiently cloaked with state authority to implicate constitutional guarantees—the second "essential element" of a § 1983 claim, as identified by the Court of Appeals in *Dunn v. Tennessee*, 697 F.2d at 125.