776 So.2d 142 (1999)
M.V.S.
v.
V.M.D.
2980595.
Court of Civil Appeals of Alabama.
December 3, 1999.
Rehearing Denied March 10, 2000.
*144 George L. Simons, Mobile, for appellant.
Richard E. Shields of McCleave, Roberts, Shields & Green, P.C., Mobile, for appellee V.M.D.
J. Coleman Campbell and James E. Long, asst. attys. gen., Department of Human Resources, for appellee Attorney General Bill Pryor.
YATES, Judge.
A child, J.J.S., was born out of wedlock on February 21, 1997. On November 3, 1997, the mother, A.D.W., placed the child with the State of Alabama for adoption. On November 7, 1997, V.M.D., the adoptive mother, filed a petition in the Mobile Probate Court to adopt the child. The petition listed M.V.S. as the putative father.[1] On November 10, 1997, the probate court entered an interlocutory order of adoption, granting custody to V.M.D., setting a dispositional hearing for February 19, 1998, and ordering that the putative father be served with notice, pursuant to § 26-10A-17, Ala.Code 1975.
On December 17, 1997, M.V.S. filed an objection to the adoption. Counsel for M.V.S. moved to withdraw from the case on December 30, 1997. M.V.S. subsequently retained other counsel and, on January 14, 1998, filed a motion to contest the adoption. In this motion, M.V.S. challenged the constitutionality of § 26-10C-1(i).
On January 15, 1998, the probate judge appointed a guardian ad litem for the child J.J.S. and ordered that the attorney general be given notice of the challenge to the statute.
On May 21, 1998, the probate court held a hearing, wherein M.V.S., his wife, two character witnesses for V.M.D., and A.D.W. testified. Following the hearing, the probate judge denied the contest to the adoption. M.V.S. appeals.
M.V.S. argues that § 26-10C-1 et seq., Ala.Code 1975, referred to as the "Putative Father Registry Act," is unconstitutional as to putative fathers, because, he argues, *145 it does not afford them notice and an opportunity to be heard. M.V.S. also argues that § 26-10C-1 violates the Equal Protection Clause of the United States Constitution and equal-protection guarantees of the Alabama Constitution. He argues that putative fathers who do not file an intent to claim paternity pursuant to the Putative Father Registry are arbitrarily treated differently from putative fathers who do file an intent. Last, M.V.S. argues that the Putative Father Registry Act cannot be reconciled with the Alabama Adoption Code.
Section 26-10C-1(i) provides:
"(i) Any person who claims to be the natural father of a child and fails to file his notice of intent to claim paternity pursuant to subsection (a) prior to or within 30 days of the birth of a child born out of wedlock, shall be deemed to have given an irrevocable implied consent in any adoption proceeding."
The problem with M.V.S.'s argument is that he had actual notice of the proceeding and was given a full opportunity by the probate court to be heard in contesting the adoption before any final order of adoption was enteredin spite of his not complying with the 30-day requirement of § 26-10C-1. In fact, M.V.S. appeared, testified, and was represented by counsel at the proceeding.
A litigant cannot make for other persons constitutional arguments that do not affect him. "[A] litigant may only assert his own constitutional rights or immunities." McGowan v. Maryland, 366 U.S. 420, 429, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961). "The determination as to whether due process has been complied with, as in all determinations involving issues of constitutional law, must be based on the circumstances present in the case before the court." Evans v. City of Huntsville, 580 So.2d 1323, 1325 (Ala.1991), citing United States v. Raines, 362 U.S. 17, 21, 80 S.Ct. 519, 4 L.Ed.2d 524 (1960). Accordingly, M.V.S. cannot make constitutional arguments that do not affect him.
Following the proceeding, the probate court found that M.V.S. had not established a substantial relationship with the child. In Lehr v. Robertson, 463 U.S. 248, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983), the Supreme Court addressed the rights of an unwed father in an adoption proceeding. Lehr involved an illegitimate child and its father, who objected to the child's adoption. The child was born in 1976. The mother and the father were never married. The child lived with its mother and, although the father visited the child sporadically, the child was never in his custody. The father never filed with the "putative father registry." Eight months after the child's birth, the mother married another man. When the child was two years old, the mother's husband petitioned a New York court to adopt the child.
The New York statute under review in Lehr required that notice of adoption be given to seven categories of putative fathers who, as the Court explained, were likely to have assumed some responsibility for the care of the child. Included in the categories was a putative father who had filed with the putative father registry. The Supreme Court of the United States reviewed this notice provision and found that it adequately protected the unwed father's inchoate interest in establishing a relationship with his child. The Court stated that the New York legislature's refusal to adopt a more "open-ended notice requirement" for the putative father was not arbitrary, given the state's legitimate interest in "facilitating the adoption of young children and having the adoption proceeding completed expeditiously." Lehr, 463 U.S. at 265-66, 103 S.Ct. 2985.
The Lehr court stated:
"When an unwed father demonstrates a full commitment to the responsibilities of parenthood by `com[ing] forward to participate in the rearing of his child,' Caban [v. Mohammed], 441 U.S. [380] at 392[, 99 S.Ct. 1760, 60 L.Ed.2d 297 (1979)] [(1979)], his interest in personal *146 contact with his child acquires substantial protection under the Due Process Clause.... But the mere existence of a biological link does not merit equivalent constitutional protection."
463 U.S. at 261, 103 S.Ct. 2985.
"The significance of the biological connection is that it offers the natural father an opportunity that no other male possesses to develop a relationship with his offspring. If he grasps that opportunity and accepts some measure of responsibility for the child's future, he may enjoy the blessings of the parent-child relationship and make uniquely valuable contributions to the child's development. If he fails to do so, the Federal Constitution will not automatically compel a State to listen to his opinion of where the child's best interests lie."
463 U.S. at 262, 103 S.Ct. 2985.
"The Court [in Caban v. Mohammed, 441 U.S. 380, 99 S.Ct. 1760, 60 L.Ed.2d 297 (1979)] made it clear ... that if the father had not `come forward to participate in the rearing of his child, nothing in the Equal Protection Clause [would] preclud[e] the State from withholding from him the privilege of vetoing the adoption of that child.'"
463 U.S. at 267, 103 S.Ct. 2985.
Lehr made it clear that a biological link with the child does not automatically give the natural father a constitutional right to withhold consent to an adoption. Instead, the natural father must have established a substantial relationship with the child to merit constitutional protection.
The probate court in the present case found that the putative father had not established a substantial relationship with the child. Again, we note that M.V.S. had notice of the proceeding, appeared, testified, and was represented by counsel at the proceeding. In regard to its finding that M.V.S. had failed to establish a relationship with the child, the probate court made the following findings of fact:
"Testimony revealed that ... M.V.S., a married man, is the father of two (2) children. Evidence disclosed that while married to S.S., M.V.S. engaged in a sexual relationship with A.D.W. who was eighteen (18) years of age and he approximately forty-three (43) at the inception of the relationship. Upon learning that A.D.W. had become pregnant, M.V.S. attempted to have A.D.W. seek an abortion. When A.D.W. refused, M.V.S. discontinued financial assistance and ended for the time his relationship with A.D.W.
"From the child's birth on February 21st, 1997, until November 1997, the child, J.J.S., lived with his birth mother, A.D.W., in the home of his maternal grandmother. Subsequently, in early November, 1997, when the birth mother, A.D.W., was twenty (20) years of age, she voluntarily relinquished custody of her child and consented to the Petitioner, V.M.D., adopting the child, J.J.S. Since then the child has resided with the Petitioner, V.M.D.
". . . .
"It was testified that during the eight and one-half months that the child resided with his natural mother, A.D.W., the Movant, M.V.S., reestablished contact with A.D.W. and visited her on approximately five (5) occasions. It was stated, however, that M.V.S. saw the child only for a few minutes on these occasions. It was also testified that on the third visit, A.D.W., the minor child, and the Movant, M.V.S., shared the same hotel room.
"Receipts submitted in evidence by the Movant, M.V.S., disclosed that the Movant had given the birth mother, A.D.W., $1,765.00 during the eight and one/half (8 ½) months while the birth mother had custody of the child. The purpose of the gift was vague. However, it was revealed that A.D.W. did return to Atlanta for a brief visit during the stated period.
"While the child was in the custody of the birth mother, A.D.W., it was testified *147 that she discussed with the Movant, M.V.S., his need to sign an `affidavit of paternity.' It was also testified that M.V.S. never signed a paternity affidavit; failed to legitimate the child; failed to have his name added to the birth certificate as the father of the child; failed to attend the birth of the child; nor register pursuant to the Putative Father Registry Act. While the Movant, M.V.S. did not sign a consent to the adoption of J.J.S. when contacted by the attorney for the Petitioner, V.M.D., he did file in the Juvenile Court of Mobile, Alabama, a petition for custody of the child.
"Upon close review of all evidence, the Court concludes that M.V.S. failed to provide within his available, reasonable means pre-birth assistance, expenses for prenatal care, or the living expenses of the unwed mother, A.D.W., at a time when such help and support were most needed.
"The evidence further revealed that after the birth of the child, the Movant, M.V.S., failed to show any apparent interest or concern for the child's welfare, took no action to become a dependable part of the child's life nor establish a full social and financial commitment to provide a substantial relationship with the child, J.J.S.
". . . .
"Evidence supports the Court's finding that M.V.S. failed to establish any parental commitment or substantial relationship with the child, J.J.S. Accordingly, M.V.S. relinquished any constitutional right to be recognized as the father of the child, to be given procedural due process, notice, an opportunity to be heard or right to prevent the adoption of J.J.S. Where the putative father fails to establish a constitutionally protected relationship with the child, no substantive due process claim exists."
We note that M.V.S.'s own brief barely touches on the factual basis for his claim to custody of the child and essentially concedes that his relationship with the child was inadequate, by euphemistically characterizing that relationship as follows:
"The reality in this case is this: In the course of an extramarital affair, the mother became pregnant. The affair had already jeopardized his marriage and the father tried to convince the mother to have an abortion. She refused to do so and they cut all ties with each other. The mother returned to her home in Alabama and left the father in Georgia. She did not ask him for any financial assistance. They did meet once prior to the birth of the child and in that meeting they did discuss the child and what his name and religion would be. After the child was born the father made telephone calls to the mother, traveled to Alabama on a fairly regular basis to visit the child and the mother and gave the mother funds for the child's support. The mother surrendered custody of the child to the Appellee and consented to the adoption of the child by the Appellee without first consulting with or telling the father that she was going to do so. The father's first indication that an adoption was underway was a telephone call from an attorney. Prior to that telephone call the father had every reason to believe that his child would continue to live with the mother."
We find this to be the reality in this case: At the age of 43, M.V.S., a married man with children, began having sexual intercourse with A.V.D., an 18-year-old. M.V.S. provided A.V.D. with a bank account, money, and the use of a car. A.V.D. got pregnant. When A.V.D. refused to have an abortion, M.V.S. closed the bank account, took back the car, and stopped providing A.V.D. with money. M.V.S. stated in a letter to A.V.D. that he could not handle a child from A.V.D. and that A.V.D. would be committing various sins, such as selfishness and sex outside of the bonds of marriage, if she did not abort the *148 child. M.V.S. did not pay for or arrange prenatal care, medical care, or other necessities while A.V.D. was pregnant with the child he now wants to care for. During the pregnancy, M.V.S. did nothing to legally establish a parental commitment to the child.
A.V.D. notified M.V.S. of the birth of the child and told him that if he wanted to be listed as the father, he would have to contact officials in Alabama to have his name added to the birth certificate. M.V.S. never contacted officials in Alabama to have his name placed on the birth certificate. M.V.S. never filed to legitimate the child or to acknowledge the child. At no time before the child's birth, after the child's birth, after the child's placement for adoption, or until the present time, has M.V.S. filed a paternity acknowledgment form under § 26-17-22.
M.V.S. visited A.V.D. and the child on three occasions before the child was placed for adoption. Yet, M.V.S. took no action to establish paternity. On his last visit to see the child, after the child had been placed for adoption, M.V.S. contacted a lawyer about challenging the adoption, but did nothing further at that time.
During the few visits M.V.S. did have with the child, he never asked to hold the child. M.V.S. held the child only once and that was because A.V.D. had placed the child in his arms. On one occasion, M.V.S. told A.V.D. that the child was ugly and threw a pillow at the child.
The United States Supreme Court has recognized that it is not biology alone that triggers constitutional recognition for an unwed father, but, rather, a substantial relationship. The probate court correctly found that M.V.S. did not establish a substantial relationship with the child.
The second problem with M.V.S.'s argument is that § 26-10C-1 does provide a putative father with notice and an opportunity to be heard if the putative father, within 30 days of the birth of any child born out of wedlock, files a notice of intent to claim paternity.
On January 1, 1997, the Putative Father Registry Act became effective. The Act directs the Department of Human Resources to establish a registry of fathers of children born out of wedlock. § 26-101. The registry includes a putative father's name, Social Security number, date of birth, and address. § 26-10C-1(a). Names are gathered from two sources: adjudications of paternity in Alabama courts and the courts of other states, and voluntary filings from men who wish to claim paternity or who have already acknowledged a child through legitimization, as provided for in § 26-11-1 through § 26-11-3. § 26-10C-1(a).
Upon an adjudication of paternity, the Alabama courts are required to supply the registry with the pertinent information. § 26-10C-1(b). If, pursuant to the Act, a putative father wishes to file a notice of intent to claim paternity, he must include the prescribed information about himself, the mother, the infant, and the possible dates of conception. § 26-10C-1(c). Failure to file a notice of intent to claim paternity before the child's birth or within 30 days after the child's birth will result in the father's being deemed to have given irrevocable implied consent to any adoption proceeding. § 26-10C-1(f). If he files a notice of intent to claim paternity, the putative father is entitled to notice of the pendency of an adoption proceeding involving the child. § 26-10C-1(f). Also, a notice, once filed, can be revoked at any time. § 26-10C-1(d). An unrevoked notice may be used as evidence by anyone other than the putative father in any action where paternity of the child is relevant. § 26-10C-1(e).
Any court may obtain the names and addresses of persons listed on the registry from the Department of Human Resources. § 26-10C-1(f). The Department of Human Resources must also send a copy of the notice of intent to claim paternity to any court handling the adoption of *149 a child born to a woman listed in the registry as having had sexual intercourse with the putative father within 300 days before the birth to the child. § 26-10C-1(f). Otherwise, the registry is completely confidential. § 26-10C-1(f).
Anyone who knowingly or intentionally registers false information with the registry commits a Class A misdemeanor. § 26-10C-1(j)(1). Likewise, any person who knowingly or intentionally releases confidential information included in the registry commits a Class A misdemeanor. § 26-10C-1(j)(2). An affirmative defense to such a release under this subsection of the Act is provided for Department of Human Resources employees who act in good faith and with reasonable diligence. § 26-10C-1(j)(2).
The legislature apparently concluded that a man concerned that he has impregnated a woman, and who is interested in taking responsibility for his offspring, should take affirmative action by filing with the registry. The effort required for filing with the registry is minimal. In fact, the legislature mandated that the Department of Human Resources create a form to ease the filing requirements. See § 26-10C-1(g). The Supreme Court noted in Lehr that the unwed father's right to notice of adoption proceedings was within his control because, "by mailing a postcard to the putative father registry, he could have guaranteed that he would receive notice of any proceedings to adopt [the child]." 463 U.S. at 264, 103 S.Ct. 2985. The Supreme Court in Lehr ruled that due process for unwed fathers requires that state law provide an adequate opportunity for them to claim paternity and to take responsibility for their children in a timely manner. Lehr recognized that limits on procedural protection for a putative father are necessary from the perspective of the child, who needs a stable start in life and needs stability early.
Looking at other jurisdictions with paternity-registry laws, we note that Nebraska requires an unwed father's consent to adoption only if he files a notice of intent to claim paternity before, or within five days after, the birth of the child. Neb. Rev.Stat. § 41-104.02. The Nebraska Supreme Court has upheld the constitutionality of the statute. Friehe v. Schaad, 249 Neb. 825, 545 N.W.2d 740 (1996). The Nebraska Supreme Court held that the unwed father had it within his power to assert his rights and to obtain an opportunity to be heard, by filing notice of intent to claim paternity.
In Wells v. Children's Aid Society of Utah, 681 P.2d 199 (Utah 1984), the Utah Supreme Court upheld a Utah statute against due-process challenges. The statute required that the putative father file his notice of claim to paternity before the date the child is released to the state adoption agency.
In Hylland v. Doe, 126 Or.App. 86, 867 P.2d 551 (1994), the Court of Appeals of Oregon held that an unwed father's failure to file a notice of paternity barred him from receiving notice of a petition for adoption and also from contesting the adoption.
In In re C.J.S., 903 P.2d 304 (Okla.1995), the Oklahoma Supreme Court held that the putative father was not statutorily entitled to notice of a hearing or a petition to terminate his parental rights. The putative father had not been adjudicated to be the father, was not openly living with the mother, was not listed on the birth certificate, did not at the time of the termination proceedings hold himself out to be the father, and had not registered with the paternity registry, and the mother had not identified him as the father. The court further held that failure to give such notice did not violate the putative father's due process rights.
Petition of K.J.R., 293 Ill.App.3d 49, 227 Ill.Dec. 190, 687 N.E.2d 113 (1997), involved a putative father's failure to register within 30 days after the birth of the child. The Illinois Appellate Court held that the birth mother's misrepresentation *150 that he was not the father did not excuse the putative father's failure to register with the putative father registry. The putative father knew that he had had sexual relations with the mother during the time the child could have been conceived, and he knew of the pregnancy before the birth of the child. In dicta, the court further stated that even if the putative father had relied on the mother's misrepresentation that another man was her child's father, the putative father still would have been required to file within 10 days of the date he learned of the fraud, to avoid waiving his rights under the statute. The putative father's due-process rights were not violated by requiring him to take specified actions within the time limits provided by statute, in order to preserve his parental rights. At the point at which the putative father has failed to comply, the Illinois Appellate Court held, the child's right to a stable environment and finality becomes paramount and the putative father loses all right to intervene in adoption proceedings or to vacate finalized adoption orders.
Walker v. Campbell, 711 N.E.2d 42 (Ind. App.1999), is distinguishable from the case at bar because the father in Walker created a substantial relationship with the child. That case involved a father and the paternal grandparents' appealing from an order granting the petition for adoption of the child by the child's mother and her husband. The child was born out of wedlock in 1991. For six years, the father paid monthly child support and the father and grandparents regularly visited the child. The Walker court held that the father was entitled to an evidentiary hearing on his objection to the child's adoption, based on his substantial relationship with the child.
The Alabama legislature has made the policy decision that the father of a child born out of wedlock must comply with certain legal requirements in order to establish parental rights. We do not think it violates the constitutional guarantee of due process, or that it is even harsh, to require those responsible for bringing children into the world outside of marriage to comply with those statutes that give them the opportunity to assert parental rights. In particular in this case, we are not dealing with a case where the father did not know of the pregnancy and the birth. Therefore, even if the probate court had not afforded M.V.S. a hearing, because of his failure to register the claim of paternity within 30 days of the child's birth, as required by § 26-10C-1, such a denial would not have been unconstitutional. (Again, M.V.S. did have a hearing and the probate court found that M.V.S. had not established a substantial relationship with the child.)
There are compelling reasons for the legislature's providing a specified period within which to assert parental rights as an unwed father. If adoption were precluded until a putative father acted to assert his rights, then protracted litigation would undoubtedly ensue. Take the widely publicized cases of In re Baby Girl Clausen, 442 Mich. 648, 502 N.W.2d 649 (1993), and In re Kirchner, 164 Ill.2d 468, 208 Ill.Dec. 268, 649 N.E.2d 324 (1995), cert. denied, 515 U.S. 1152, 115 S.Ct. 2599, 132 L.Ed.2d 846 (1995), better known as the "Baby Jessica" and "Baby Richard" cases. In both cases, the biological mothers placed children for adoption. After finding out about the adoptions, both biological fathers claimed that they had not properly given their consent to the adoptions. Both cases were litigated for years and were eventually resolved in favor of the biological fathers. The children (ages two and four) were taken from the only homes they had ever known in order to protect the rights of their biological fathers. A law such as the Putative Father Registry Act would have prevented such an adoption fiasco.
An unwed father, by merely registering under the Act, obtains a right to notice and an opportunity to be heard. In discussing Illinois's Putative Father Registry Act, which was adopted in response to the Baby Richard case, one writer has noted, with *151 regard to the burden placed on the unwed father:
"The burden placed on putative fathers under Illinois's new legislation is not necessarily out of step with modern mores or the realities of contemporary heterosexual relationships. Neither is it completely unrealistic. To meet the burden which the new legislation places on a putative father, he need neither remain in contact with a woman with whom he has had sexual intercourse, nor turn to other sources of information to determine whether he has conceived a child with her. Under the new legislation, a putative father need only file with the putative father registry based on his knowledge that he has had intercourse with a woman and commence a parentage action within thirty days of that filing. His interests will not be jeopardized if he ends relations with her, and his social habits are not, therefore, greatly affected. By simply mailing a postcard to the registry and commencing a parentage action, tasks which can hardly be labelled a burden, a putative father can preserve his rights to notice and consent."
Mahrukh S. Hussaini, Incorporating Thwarted Putative Fathers into the Adoption Scheme: Illinois Proposes a Solution After the "Baby Richard" Case, 1996 U. Ill. L.Rev. 189, 220 (1996).
M.V.S. argues that the Putative Father Registry Act violates the Equal Protection Clause of the United States Constitution and the equal-protection guarantees of the Alabama Constitution[2] because putative fathers who have registered are treated differently from putative fathers who have not registered under the Act. Putative fathers who have registered under the Act are entitled to notice of any adoption proceeding. As we stated earlier in this opinion, M.V.S. had notice of the adoption proceeding, he testified in court, and he was represented by counsel before the adoption. Also as discussed earlier in this opinion, M.V.S. cannot make constitutional arguments that do not affect him. Further, this is not a case where the putative father did not know of the birth within the 30 days provided by the Putative Father Registry Act. In fact, M.V.S. knew the mother was pregnant, knew of the birth, and was specifically told by the mother that he should contact officials in Alabama if he wanted to be listed as the father. Nevertheless, we will address whether the Act violates the Equal Protection Clause.
A state may not enact legislation that treats persons "similarly situated" differently. City of Cleburne, Texas v. Cleburne Living Center, Inc., 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). "The sovereign may not draw distinctions between individuals based solely on differences that are irrelevant to a legitimate governmental objective." Lehr, 463 U.S. at 265, 103 S.Ct. 2985, citing Reed v. Reed, 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971). The legitimate government objective with respect to the enactment of the Putative Father Registry Act is to create a means, independent of the biological mother, by which a man can keep apprised of the status of a child he might have conceived out of wedlock.
In determining whether statutes violate the Equal Protection Clause, we apply different levels of scrutiny to different types of classifications. We apply "strict scrutiny" in cases involving "classifications based on race or national origin and classifications affecting fundamental rights." Clark v. Jeter, 486 U.S. 456, 461, 108 S.Ct. 1910, 100 L.Ed.2d 465 (1988). "Intermediate scrutiny" traditionally applies to discriminatory classifications arising out of illegitimacy and gender. See Mills v. Habluetzel, 456 U.S. 91, *152 102 S.Ct. 1549, 71 L.Ed.2d 770 (1982); Craig v. Boren, 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976). A lessor level of scrutiny is "rational-basis scrutiny." Under rational-basis scrutiny, the classification must, at a minimum, be rationally related to a legitimate governmental purpose. San Antonio Independent School Dist. v. Rodriguez, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973). M.V.S. argues that we should apply strict scrutiny in this case because, he says, a fundamental right to parent is being infringed. However, a strict-scrutiny analysis does not apply simply because a case involves parental rights.
In Quilloin v. Walcott, 434 U.S. 246, 98 S.Ct. 549, 54 L.Ed.2d 511 (1978), the Supreme Court reviewed a Georgia statute that required both parents' consent to an adoption if the child was born in wedlock, but required only the mother's consent if the child was born out of wedlock, unless the father had legitimated the child. The Court held that "[u]nder any standard of review," the statute did not violate the Equal Protection Clause, because the state could take into consideration that an unwed father, unlike a married or divorced one, had "never exercised actual or legal custody over his child, and thus ha[d] never shouldered any significant responsibility with respect to the daily supervision, education, protection, or care of the child." 434 U.S. at 256, 98 S.Ct. 549.
The Supreme Court, in Parham v. Hughes, 441 U.S. 347, 99 S.Ct. 1742, 60 L.Ed.2d 269 (1979), rejected a challenge to a Georgia law that fathers, but not mothers, of children born out of wedlock could not inherit from their children unless they had legitimated them. In the plurality opinion of Parham, four Justices concluded that "the statutory classification does not discriminate against fathers as a class but instead distinguishes between fathers who have legitimated their children and those who have not." 441 U.S. at 356, 99 S.Ct. 1742. The four Justices concluded, under rational-basis scrutiny, that the statute was constitutional. Justice Powell, concurring in the result, believed that intermediate scrutiny applied, but agreed that the statute was constitutional even under that standard.
In Caban v. Mohammed, 441 U.S. 380, 99 S.Ct. 1760, 60 L.Ed.2d 297 (1979), the Supreme Court held that it violated the Equal Protection Clause, under intermediate scrutiny, to grant the mother the power to veto an adoption, but not to grant a veto to the father where the father had admitted paternity and had participated in the rearing of the children. However, the Supreme Court stated that if the father had not "come forward to participate in the rearing of his child, nothing in the Equal Protection Clause [would] preclud[e] the State from withholding from him the privilege of vetoing the adoption of that child." 441 U.S. at 392, 99 S.Ct. 1760.
In Lehr, the Supreme Court held that the Equal Protection Clause had not been violated by the legislation at issue:
"The legislation at issue in this case, N.Y. Dom. Rel. Law §§ 111 and 111-a (McKinney 1977 and Supp.1982-1983), is intended to establish procedures for adoptions. Those procedures are designed to promote the best interests of the child, to protect the rights of interested third parties, and to ensure promptness and finality. To serve those ends, the legislation guarantees to certain people the right to veto an adoption and the right to prior notice of any adoption proceeding. The mother of an illegitimate child is always within that favored class, but only certain putative fathers are included."
463 U.S. at 266, 103 S.Ct. 2985.
In Lehr, the putative father argued that the statute violated the Equal Protection Clause in that it treated the mother differently from the father. The Court distinguished between a mere biological link and an established familial relationship, noting that the mere biological link is entitled to less constitutional protection. Applying the intermediate-scrutiny test, the Supreme *153 Court held that the Equal Protection Clause was not violated because if "one parent has an established custodial relationship with the child and the other parent has either abandoned or never established a relationship, the Equal Protection Clause does not prevent a State from according the two parents different legal rights." 463 U.S. at 267-68, 103 S.Ct. 2985. In a footnote, the Court noted that the putative father had also made an equal-protection argument based upon the manner in which the statute distinguishes among classes of fathers. The Supreme Court held that the statutory distinction was "rational" and did not violate the Equal Protection Clause. 463 U.S. at 268, n. 27, 103 S.Ct. 2985.
Based on the cases discussed above, we conclude that rational-basis scrutiny would apply in the instant case, where a putative father is arguing that he is being treated differently from other putative fathers. We must then ask whether treating fathers who have registered under the Act differently from those who have not is rationally related to a legitimate government interest. We hold that it is. First, the State has an interest in identifying, as soon as possible, those putative fathers who are willing to parent children born out of wedlock. The putative father registry provides a legal means to ascertain within a short time of a child's birth whether the biological father is going to assert his rights and perform his corresponding duties. If neither biological parent is going to care for the child, then the putative father registry also acts to facilitate adoptions, in order to provide early and uninterrupted bonding of the child with the adoptive parents. We note, too, that the instant case, like Lehr, does not involve the constitutionality of terminating an established familial bond; instead, we are concerned with the constitutionality of terminating the opportunity to form such a bond. A putative father who wishes to have the opportunity to form such a bond must timely assert his rights under the Act.
The Alabama legislature has chosen to infer irrevocable consent to adoption, by any biological father who has not acted before the birth of the child or within 30 days of the birth. M.V.S. argues that the 1997 Putative Father Registry Act cannot be reconciled with the Alabama Adoption Code, which was adopted in 1990. The legislature clearly intended for the Putative Father Registry Act to apply to adoption proceedings. See § 26-10C-1(i).
"A fundamental rule of statutory construction is that `all statutes relating to the same subject or having the same general purpose must be read together to constitute one law.' Florence v. Williams, 439 So.2d 83, 87 (Ala.1983). A court construing a statute must look not only to the language of the statute, but also to the `purpose and object of the enactment, and its relation to other laws and conditions which may arise under its provisions.' Siegelman v. Folmar, 432 So.2d 1246, 1249 (Ala.1983). Additionally, in construing a statute, the court's duty is to `ascertain and effectuate the legislative intent expressed in the statute, which may be gleaned from the language used, the reason and necessity for the act, and the purpose sought to be obtained.' Bama Budweiser of Montgomery, Inc. v. Anheuser-Busch, Inc., 611 So.2d 238, 248 (Ala.1992). Furthermore, if a statute is susceptible to two constructions, and one is workable and fair but the other is unworkable and unjust, the court assumes that the legislature intended that which is workable and fair. Ex parte Hayes, 405 So.2d 366 (Ala.1981)."
T.S. v. J.P., 674 So.2d 535, 536-37 (Ala.Civ. App.), cert. quashed, 674 So.2d 535 (1995)(holding that the Alabama Adoption Code and the Child Protection Act must be read in pari materia).
It follows that the Putative Father Registry Act must be read in pari materia with the Alabama Adoption Code. Section *154 26-10A-17(a)(10), a part of the Alabama Adoption Code, requires that a putative father be given notice of a pending adoption. Section 26-10A-7(a)(5), also a part of the Alabama Adoption Code, requires the putative father's consent or relinquishment if he has responded within 30 days to the notice he received under § 26-10A-17(a)(10). Section 26-10C-1(i) of the Putative Father Registry Act, which went into effect in 1997, now provides that the putative father will irrevocably consent to an adoption unless, within 30 days of the birth of the child, he files a notice to claim paternity. Only where the putative father has complied with the provisions of the Putative Father Registry Act is the consent of the father to the adoption required today. Section 26-10C-1(f), specifically provides that when the court handling the adoption "receives said notice of the intent to claim paternity, that court shall forthwith give notice of the pendency of the adoption proceeding to the putative father listed in such notice of intent to claim paternity." There would be no purpose in providing unregistered putative fathers with notice under § 26-10A-17(a)(10), because a right to consent to the adoption would have been waived by a failure to register under the newly enacted Putative Father Registry Act. Putative fathers who have registered would be entitled to notice under § 26-10A-17(a)(10), and their consent or relinquishment would be required under § 26-10A-7(5), provided that they responded within 30 days of the notice of the pending adoption.
The judgment of the probate court is affirmed.
AFFIRMED.
ROBERTSON, P.J., and MONROE and THOMPSON, JJ., concur.
CRAWLEY, J., dissents.
CRAWLEY, Judge, dissenting.
I conclude that the trial court erred, as a matter of law, by finding that M.V.S. (the "father") did not have a substantial relationship with the child. I agree with the application of Lehr v. Robertson, 463 U.S. 248, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983), to this case. The Supreme Court stated in Lehr:
"When an unwed father demonstrates a full commitment to the responsibilities of parenthood by `com[ing] forward to participate in the rearing of his child,' Caban [v. Mohammed], 441 U.S. [380] at 392[, 99 S.Ct. 1760, 60 L.Ed.2d 297 (1979)], his interest in personal contact with his child acquires substantial protection under the due process clause. At that point it may be said that he `act[s] as a father toward his children.' Id. at 389, n. 7, 99 S.Ct. 1760. But the mere existence of a biological link does not merit equivalent constitutional protection....
"The significance of the biological connection is that it offers the natural father an opportunity that no other male possesses to develop a relationship with his offspring. If he grasps that opportunity and accepts some measure of responsibility for the child's future, he may enjoy the blessings of the parent-child relationship and make uniquely valuable contributions to the child's development. If he fails to do so, the Federal Constitution will not automatically compel a state to listen to his opinion of where the child's best interests lie."
463 U.S. at 261, 103 S.Ct. 2985.
The father testified that the mother notified him of the birth of the child and that he visited the child about two weeks after the child's birth. The father bought a stroller, a baby bed, and some clothes for the child and gave the mother a $225 money order. The father traveled from Atlanta, his home, to Mobile, the mother and child's home, every four to six weeks. He testified that he gave the mother approximately $1,700 until the mother relinquished her rights to the child for adoption.
*155 As the majority opinion states, the father is about 25 years older than the mother, is married, and asked the mother to have an abortion. I also concede that the father was not always supportive of the mother during the pregnancy. However, Lehr does not require that the father be an exemplary unwed father. Lehr requires that an unwed father "accept[] some measure of responsibility for the child's future." Id. I have already expressed my disagreement with the relevancy of the pre-birth conduct of an unwed father as evidence of abandonment in adoption proceedings. See C.V. v. J.M.J. [Ms. 2970889, Feb. 12, 1999] ___ So.2d ___ (Ala.Civ.App.1999) (Crawley, J., dissenting); B.F. v. L.J.S., 771 So.2d 1029 (Ala.Civ.App.1999) (Crawley, J., dissenting).
I would rely heavily on Walker v. Campbell, 711 N.E.2d 42 (Ind.App.1999), in which the Indiana Court of Appeals held that a man who had fathered a child out of wedlock and had failed to register in accordance with Indiana's Putative Father Registry requirements was nevertheless entitled to contest the adoption of his child. The father in Walker had not been adjudicated to be the father of the child, but he had provided regular child support and had maintained regular contact with the child for six years. The mother placed the child in this present case for adoption before the child was one year old. I would conclude that the father in this present case has accepted some responsibility for the child, as required by Lehr, during the months before the child was placed for adoption. Therefore, I must dissent.
NOTES
[1] D.N.A. testing later showed that M.V.S. was the biological father.
[2] The main opinion in Ex parte Melof, 735 So.2d 1172 (Ala.1999), stated that the Alabama Constitution has no equal-protection guarantee. (Per Houston, J., with four Justices concurring specially and two Justices concurring in the result). Therefore, we will discuss only M.V.S.'s Fourteenth Amendment claim.